EXHIBIT 2

UNITED STATES' RESPONSE TO COMMENTS

1. Comment:

The Wisconsin Department of Natural Resources (Wisconsin DNR) opines that the Decree should have required that IPL install on Unit 4 a Selective Catalytic Reduction (SCR) device as opposed to a Selective Non-Catalytic Reduction (SNCR) device, because it asserts that an SCR is more widely used and more effective at reducing emissions than an SNCR.

Response:

The commenter is correct that an SCR is a common, effective control device to limit NOx emissions. In fact, emissions from Petersburg Units 2 and 3, two of the four boiler units comprising IPL's Petersburg Facility (Facility), are currently controlled with an SCR. Declaration of Ethan Chatfield (Chatfield Decl.), at ¶ 13 (attached). An SNCR, however, which the Consent Decree (Decree) requires IPL to install on Petersburg Unit 4, is also designed to result in significant NOx emission reductions. *Id*. Based on good-faith negotiations, the parties agreed, as one of the comprehensive compliance measures in the Decree, that IPL would install an SNCR on Petersburg Unit 4. EPA anticipates that an SNCR-controlled Unit 4 will contribute to a substantial reduction in NOx emissions at the Facility.[1] *Id*.

Further, the proposed Decree requires that all NOx controls on all four of the Petersburg Units be operated continuously, as defined in Paragraph 5(g) of the Decree, at emission rates reduced from current permitted levels, and sets forth annual NOx tonnage limitations. Compliance with those requirements is expected to substantially reduce IPL's NOx emissions at the Facility. Chatfield Decl. ¶ 14.

2. Comment:

Wisconsin DNR asserts that the Decree does not involve or require the early retirement of any of the Facility's Units because Units 1 and 2 are already scheduled to be retired in 2021 and 2023, respectively – suggesting that the Decree's provision acknowledging IPL's intention to retire the two Units early is meaningless. In support of its comment, Wisconsin DNR cites Energy Information Administration information and Indiana's Eastern Regional Technical Advisory Committee electricity generating unit emission projection tool, noting IPL's intention to voluntarily retire Unit 1 in 2021 and Unit 2 in 2023.

Response:

Wisconsin DNR is correct that the Decree is not the first and only forum in which IPL signified its intention to retire Petersburg Units 1 and 2 early. In December 2019, IPL filed its triennial Integrated Resource Plan (IRP) with the Indiana Utility Regulatory Commission,

---

[1] As noted in the Decree at Paragraph 7 and discussed further below, if IPL permanently retires Petersburg Units 1 and 2 prior to the deadline for installing the SNCR, IPL is relieved of the requirement to install the SNCR on Petersburg Unit 4.

officially announcing its intention to retire Petersburg Unit 1 by 2021 and Petersburg Unit 2 by 2023, and to make a transition to cleaner resources.[2]

As IPL explained in the IRP:

> Based on extensive modeling, IPL has determined that the cost of operating Petersburg Units 1 and 2 exceeds the value customers receive compared to alternative resources. Retirement of these units allows the company to cost-effectively diversify the portfolio and transition to cleaner, more affordable resources while maintaining a reliable system.

IPL's 2019 IRP's Non-Technical Summary, at 6.

As Wisconsin DNR pointed out, the Energy Information Administration (part of the U.S. Department of Energy), in a report filed the first quarter of 2020, noted IPL's intention to retire the two units early, relying on information provided by IPL based on IPL's 2019 IRP.

Significantly, the IRP is only an expression of intention regarding the company's future. IPL retains the authority to decide to keep one or both of the Units, because the 2019 IRP and other filings do not compel IPL to retire either or both of them. As IPL, in the IRP, put it:

> The Integrated Resource Plan is viewed as a guide for future resource decisions made at a snapshot in time. Resource decisions, particularly those beyond the five-year horizon, are subject to change based on future analyses and regulatory filings.

IPL's 2019 IRP's Non-Technical Summary, at 2.

In contrast, by concretizing IPL's intention in the Consent Decree to retire Petersburg Units 1 and 2 by 2023 and tying it to IPL's obligation to install an SNCR on Unit 4 by that date, the proposed Decree creates a strong incentive for IPL to follow through with its expressed intention, even if circumstances should change. Knowing that the deadline for complying with the Decree's requirement to install an SNCR is approaching relatively soon, and that the company will be excused from such obligation should it retire Petersburg Units 1 and 2 prior to that deadline, IPL is less likely than otherwise to revise its stated plans to retire those Units by

---

[2] According to the Indiana Utility Regulatory Commission website, jurisdictional electric utilities, including IPL, are required to submit IRPs every three years in accordance with Indiana Code § 8-1-8.5-3(e)(2). As explained on the website:

> The IRPs are subject to a rigorous stakeholder process. IRPs describe how the utility plans to deliver safe, reliable, and efficient electricity at just and reasonable rates. Further, these plans must be in the public interest and consistent with state energy and environmental policies. Each utility's IRP explains how it will use existing and future resources to meet customer demand. When selecting these resources, the utility must consider a broad range of potential future conditions and variables and select a combination that would provide reliable service in an efficient and cost-effective manner.

https://www.in.gov/iurc/2630.htm.

2023. Retirement of Petersburg Units 1 and 2 by 2023 is expected to result in a much larger decrease in pollutant emissions, especially NOx, than would be expected from installing an SNCR on Unit 4. Chatfield Decl. ¶ 15.

Further, under the Decree, "retire" means to "permanently shut down and cease to operate the Unit, and to comply with applicable state and federal requirements for permanently ceasing operation of the Unit, including removing the Unit from Indiana's air emissions inventory, and amending all applicable permits so as to reflect the permanent shutdown status of such Unit." Decree ¶ 5(mm). Thus, if the Consent Decree is approved and IPL retires Petersburg Units 1 and 2 prior to the deadline for installing the SNCR, the retirement must be permanent and comply with all relevant federal and state requirements. By way of contrast, even if IPL stops operating the two Units, the IRP, in itself, does not prohibit IPL from restarting either Unit. Plaintiffs' ability to enforce IPL's decision to permanently retire those Units in accordance with the terms of the Consent Decree further highlights the benefits of concretizing IPL's plans in the context of an enforceable agreement.

    3. <u>Comment</u>:

Wisconsin DNR asserts that the 30-day rolling average NOx emission rates in the proposed Consent Decree are too high and do not reflect the emission rates that can actually be achieved with proper operation of available control technologies.

<u>Response</u>:

Wisconsin DNR does not provide any clarity as to what it means by "NOx emission rates in the proposed Consent Decree are too high" -- for example, which NOx emission rates in the proposed Decree are too high, and what is meant by "too high" (as opposed to what the commenter believes the rate should be). For that matter, the commenter does not identify which Units it is concerned about, and which "available control technologies" it believes will result in lower rates. Finally, the commenter does not explain what it means by "proper" operation. All such gaps make a thoughtful response to the comment difficult. Nevertheless, the United States' best effort to answer these concerns follows.

IPL has SCRs on Petersburg Units 2 and 3, installed in 2004. EPA, however, determined that IPL, prior to receiving EPA's Notice of Violation in February 2016, was operating those SCRs inconsistently. In the Complaint, the Governments alleged that IPL, at Petersburg Units 1 and 2, was out of compliance with the Prevention of Significant Deterioration (PSD) and/or Non-Attainment New Source Review (NSR) requirements of the Clean Air Act and the Indiana State Implementation Plan. Complaint ¶ 64. As a result, among other things, IPL should have obtained a PSD and/or Non-Attainment NSR permit for each of those two Units from the State. Complaint ¶ 65. A PSD or Non-Attainment NSR permit would have likely required IPL to operate each of the control devices on those Units continuously. Chatfield Decl. ¶ 16. Thus, as part of the overall relief in settlement of this matter, the proposed Decree requires that IPL

operate the SCR at Petersburg Unit 2 on a continuous basis, as if Unit 2 were operating under a PSD or Non-Attainment NSR permit.[3]

Further, although during the last several years (2017 through 2019) Petersburg Unit 2 was achieving a reported NOx *annual* emission rate of between 0.08 to 0.09 lb/mmBtu, the proposed Decree's requirement for a 0.100 lb/mmBtu NOx emission rate is based on a *30-day rolling average basis* -- a more stringent averaging period. Chatfield Decl. ¶ 17. Thus, given the Decree's requirement that IPL meet a NOx limit at Petersburg Unit 2 based on a 30-day rolling average, the negotiated rate of 0.100 lb/mmBtu is in effect an equivalent if not lower NOx emission rate than IPL's current .08-.09 lb/mmBtu rate based on an annual averaging period. *Id*. Coupled with the Decree's requirement to operate the SCR continuously, and the Decree's annual NOx tonnage limitation for Petersburg Unit 2, the Decree's 0.100 lb/mmBtu NOx rate based on a 30-day rolling averaging period is a reasonable resolution of the alleged claim related to increased NOx emissions at Unit 2.

The negotiated NOx rate for Unit 4 of 0.190 lb/mmBtu once IPL installs the SNCR, and the negotiated NOx rate for the current Low NOx Burner/Overfired Air (LNB/OFA) at Petersburg Unit 4 of 0.260 lb/mmBtu – both rates based on a 30-day rolling average basis – are consistent with rates expected to be practically achievable by those controls. *Id*. at ¶ 18. Similarly, the negotiated NOx rates for Petersburg Units 1 and 3, for which the Governments have made no claims related to increased NOx emissions, are appropriate. Specifically, the negotiated NOx rate of 0.100 lb/mmBTU for the SCR at Petersburg Unit 3, and the negotiated NOx rate of 0.220 for the LNB/OFA at Petersburg Unit 1 -- both based on a 30-day rolling average -- are consistent with rates expected to be practically achievable by those controls. *Id*. at ¶ 19. Coupled with the Decree's requirements to operate all controls continuously, and the Decree's annual NOx tonnage limitations, the negotiated NOx rates for Units 1, 3 and 4 are anticipated to substantially reduce NOx emissions at the Facility. *Id*. at ¶ 20.

Wisconsin DNR's comment suggests that the Consent Decree should not be approved because the negotiated NOx rates are not the lowest possible rates. The Governments concede that the negotiated NOx rates are not the lowest rates achievable, but the Governments cannot impose such rates unilaterally. Were the Decree disapproved on that basis and the parties forced to go back to the drawing board, the Governments are not assured of obtaining IPL's agreement to lower rates. Further, any effort to renegotiate the rates would take time and delay the deadlines for IPL's compliance with the many other significant Decree requirements intended to

---

[3] "'Continuous Operation'" and "'Continuously Operate'" in the Decree mean that when a pollution control technology or combustion control is required to be used at a Unit pursuant to this Consent Decree (including, but not limited to, a Baghouse, ESP, FGD system, LNB, OFA, Selective Catalytic Reduction device, Selective Non-Catalytic Reduction device and Sulfuric Acid Mitigation System), it shall be operated at all times that the Unit it serves is in operation, consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit." Decree, ¶ 5(g).

reduce pollutant emissions at the Facility. And, of course, there is no guarantee of success, which in the end could lead to lengthy and uncertain litigation rather than a negotiated agreement.

In any event, as explained in the Memorandum in Support of Plaintiffs' Motion for Entry, the standard for approval of a consent decree is not whether the settlement produces the best possible result, but rather whether the settlement overall is fair, reasonable, consistent with the underlying statutes and in the public interest.

4. Comment:

Comments provided by a coalition of citizen groups including the Sierra Club, the Environmental Law & Policy Center, the Hoosier Environmental Council and the Citizens Action Coalition of Indiana (hereinafter, Sierra Club) request that the Decree be revised to include the creation of what it calls a Community Environmental Action Committee (Committee) to assure community benefits. Sierra Club asserts that the Committee's charge would be to assist IPL in selecting and implementing projects that provide certain benefits to the local community near the Petersburg plant. Seven examples of such projects are enumerated. Sierra Club asks that the current Environmental Mitigation Project described in Appendix A of the Decree be cancelled, and that funds intended to be spent on that project be redirected to fund new projects to be recommended by the Committee in the amount of at least $5 million.

Response:

The Environmental Mitigation Project described in the Decree's Appendix A, in which IPL will propose for approval a project involving a new, non-emitting source of energy to power the internal load at the Petersburg Facility, was negotiated in good faith by the Governments and IPL as part of the overall comprehensive relief package of the proposed Decree. During the negotiations, a number of different proposals for a mitigation project were discussed. Ultimately, the parties determined that the one agreed to in Appendix A, discussed in more detail below, would provide meaningful environmental benefits that are tailored to redressing a portion of the harm caused by the alleged violations, and was the preferred choice of the parties. Sierra Club's request to cancel this well-thought out, diligently-negotiated project in exchange for a vague, open-ended process that may or not produce a mutually-agreed upon, valuable mitigation project (or projects) in the future is not acceptable.

Specifically, Sierra Club's proposal to form the Committee, which contemplates a plurality of community members who may well represent special interests and harbor possible conflicts of interest, does little to ensure that IPL's money is not spent on wasteful or inefficient projects designed more to generate good will than to achieve meaningful improvements in the environment. In particular, the proposal's absence of specificity or substantive criteria for the hypothetical future projects stands in stark contrast to the detailed terms and requirements set forth in Appendix A for the negotiated Environmental Mitigation Project. At the very least, Sierra Club's proposal would do away with a known, agreed-upon mitigation project redressing a portion of the harm caused by the alleged violations, benefiting the public and enforceable by the Governments, in favor of a set of unknown, to-be-determined projects -- assuming any agreement on them can ever be reached -- for which the Governments will have little or no input.

5

In short, the Governments reject Sierra Club's proposal as neither practical nor in the public interest.[4] In any event, the comment does not disclose facts or considerations indicating that the proposed Consent Decree is inappropriate, improper, or inadequate. Decree ¶ 130.

5. Comment:

Sierra Club argues that Environmental Mitigation Project (Project) should be removed from the Consent Decree on the grounds that it does not directly benefit the community. Specifically, Sierra Club opines that the Project will increase, not decrease, pollution, because the new source of power will allow the Facility's coal-fired boilers to operate more frequently than they otherwise would and therefore would increase the pollution in the local community. Sierra Club further argues that the project will enrich IPL, because the new source will reduce the operating cost of the coal-fired boilers and therefore have the effect of increasing the competitiveness of those boilers in the regional electric energy market.

Response:

The proposed Project mandated by Appendix A is designed to address the need to mitigate the harm over the years caused by IPL's alleged excess pollutant emissions in a way that will environmentally benefit the local community. The Project requires IPL to submit for EPA's and the State's approval a new, non-emitting (i.e., "clean") source of power with a rated nameplate capacity of 3.0 MW, to be connected into the Petersburg Station auxiliary electrical system in order to provide power for the internal station load. Decree, Appendix A, Parts I.B. and II.A.

Sierra Club does not provide any substantiation for its statement that, if IPL implements the Project by installing a new, non-emitting source of power to fuel the plant's internal load, IPL would operate its boilers more frequently than it otherwise would and therefore increase pollutant emissions and enrich IPL. The facts suggest otherwise. Currently, the energy that is generated for the Facility's internal load is derived from burning fossil fuels, which emits pollutants including $SO_2$ and NOx. Complaint ¶ 57. The new, non-emitting source of power for this load would consist of a renewable energy source, such as solar or wind energy, which does not generate such pollutants. Energy produced from such a "clean" source would likely offset energy that otherwise would be generated by the coal-fired boilers to serve the internal load, thereby reducing pollutant emissions at the Facility and benefitting the local community. Chatfield Decl. ¶ 22. Such environmental benefits are expected to accrue and be realized primarily over an extended length of time, which is why the proposed Decree requires that IPL operate the new, clean energy source for at least 10 years. *Id*.

---

[4] In its comment, Sierra Club states that a similar proposal was made in another Clean Air Act settlement, referencing "Settlement Agreement Between Sierra Club and DTE Energy Company and Detroit Edison Company, Civil Action No. 2:10-cv-13101-BAF-RSW (E.D. Mich.), filed May 22, 2020." That settlement agreement is a separate matter reached between Sierra Club and DTE Energy Co., to which the United States was not a party (and to which the United States objected).

6. Comment:

Sierra Club asserts that, if the Governments keep the Environmental Mitigation Project as part of the settlement, the Project should be modified in two ways. First, Sierra Club suggests that, instead of providing power to the plant's internal load, the on-site non-emitting resources should be connected to the local grid, so that the Project would provide power to the local communities and not IPL's customers in Indianapolis. Second, Sierra Club avers that the language should be revised to state that IPL will operate and maintain the non-emitting generation only as long as the plant's coal Units remain in operation, as opposed to being maintained for a full ten-year period as mandated by Appendix A. Sierra Club argues that its second suggested revision accounts for the possibility that the Facility may be retired within the next ten years, given that IPL is already planning to retire half of its Units, i.e., Petersburg Units 1 and 2, by 2023. In the absence of making this change, Sierra Club suggests that the language of Appendix A actually *requires* IPL to continue operating the Facility for at least ten years.

Response:

Given the pollutant emission reductions expected to result from replacing 3 MW of the current, coal-produced energy with the new, non-emitting power source, it is the local community, not IPL's customers in Indianapolis, who will benefit over time from the decreased emissions and cleaner air. If, as recommended by Sierra Club, the power were provided to the local grid, which is operated by Duke Energy, the Facility's internal load would not be reduced, and it is not known what emission reductions would result, if any, or where they might occur.

Sierra Club's additional suggestion, that the Project should be amended to remove the requirement that IPL operate the new, clean power source for at least 10 years, is based on a speculative scenario that IPL may retire its entire Facility before the end of that time period. Though IPL, as discussed above, has made public via its 2019 IRP its intention to retire Units 1 and 2 by 2023, the IRP gives no indication that IPL intends to retire the entire plant within the next ten years. In the event that IPL alters its current intention and decides to retire the entire Facility within the next ten years, the parties can make alternative arrangements within the parameters of the Decree. In particular, the parties could seek to modify the settlement under the Modification Section of the Decree, in ways that are mutually agreeable to all parties. *See* Decree ¶ 119. For example, the potential modification could include acceleration of Appendix A's requirement that is meant to take effect between the 10-year and 25-year operation period, namely, obligating IPL to "use good faith efforts to ensure that the [new, clean energy source] is connected to the grid and that ownership is transferred to a third party who would thereafter assume sole responsibility to operate and maintain the [new, clean energy source] to provide energy for the remainder of the 25 year period." Decree, Appendix A, Part II.B.

In any event, Sierra Club's implication that the language in Appendix A actually requires IPL to operate the coal-burning Units at the Facility for at least ten years has no basis in the terms and/or conditions of the settlement. As Sierra Club correctly notes, the Governments do not have the legal authority to require IPL to operate the Facility longer than it intends to, and nothing in the language of Appendix A or the Decree as a whole so requires.

7

When crafting any negotiated agreement, no side has a crystal ball and can possibly foresee all potential scenarios that may arise in the future. Thus, no agreement, including this one, is prescient and can possibly address all future potentialities. Appendix A addresses the current, real need (and the Governments' claims) for mitigating a portion of the harm caused by IPL's violations, and, once the Decree is entered and the Project implemented, will provide environmental benefits to the local community for years to come. *See* Chatfield Decl. ¶ 22. And as discussed above, both Appendix A and the Decree as a whole provide mechanisms that can be utilized to address, if necessary, changed circumstances should they arise in the future.

In short, none of the Sierra Club's comments discloses facts or considerations indicating that the proposed Consent Decree is inappropriate, improper, or inadequate. Decree ¶ 130. Sierra Club's requests to remove the Project entirely and/or modify it would require the parties to go back to the drawing board, with no certainty that an improved project, or any amended agreement for that matter, would result. And any effort to renegotiate the Project or any other aspect of the settlement would take time and delay the deadlines for IPL's compliance with the many significant Decree provisions intended to reduce pollutant emissions at the Facility and benefit the local community.

7. Comment:

Sierra Club does not challenge, but rather welcomes, the State-Only Environmentally Beneficial Project described in Appendix B, requiring IPL to acquire and restore ecologically significant land near the Facility. Sierra Club, however, asks that the negotiated sum of $325,000 for the State-only project be increased to at least $500,000, and suggests a number of other types of lands that could be acquired and donated to the Patoka River National Wildlife Refuge and other public areas. The commenter also suggests additional, related projects that IPL could undertake if the negotiated amount is increased to $500,000.

Response:

The State-Only Environmentally Beneficial Project is designed, among other things, to "help ameliorate and restore past detrimental effects to plant life and vegetation in the vicinity that can be attributed to high levels of sulfur dioxide, ozone and PM 2.5 emissions." Decree, Appendix B, Part I.B. Like all components of the settlement, the agreed-upon amount of $325,000 for the State-only project was the result of good-faith negotiations, which took into account the "big picture" of the settlement package in resolving the Governments' claims, including the Decree's comprehensive compliance measures, civil penalty amount shared between the United States and the State, and amount for the Environmental Mitigation Project. Indiana believes that IPL's agreement to fund the State-only project in the amount of $325,000 is very favorable and will benefit the local public and the environment to a considerable degree.

At the same time, Indiana acknowledges that there remain additional needs to conserve and restore ecologically significant land in the area, and for other important, related projects. Indiana appreciates Sierra Club's suggestions for other proposals in this regard, and will keep them in mind when considering similar projects in the future.