## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **and** | ) | |
| **THE STATE OF INDIANA,** | ) | |
| **Plaintiffs** | ) | |
| **v.** | ) | **Civil Action No. 3:20-cv-202-RLY-MPB** |
| **INDIANAPOLIS POWER & LIGHT COMPANY,** | ) | |
| **Defendant.** | ) | |

## <u>CONSENT DECREE</u>

## TABLE OF CONTENTS

I.     JURISDICTION AND VENUE ................................................................. 4

II.    APPLICABILITY ................................................................................ 4

III.   DEFINITIONS .................................................................................... 5

IV.    $NO_X$ EMISSIONS ................................................................................ 12

   A.   $NO_X$ Emission Rates and Controls ................................................... 12

   B.   Annual Tonnage Limitation for $NO_X$ ............................................... 14

   C.   Monitoring of $NO_X$ Emissions ........................................................ 14

V.     $SO_2$ EMISSIONS ............................................................................... 14

   A.   $SO_2$ Emission Rates and Controls ................................................... 14

   B.   Annual Tonnage Limitation for $SO_2$ ............................................... 15

   C.   Monitoring of $SO_2$ Emissions ........................................................ 15

VI.    PM EMISSIONS ................................................................................. 16

   A.   Optimization of PM Emission Controls ............................................ 16

   B.   PM Emission Rates and Controls ..................................................... 17

   C.   PM Emissions Testing and Monitoring Requirements ....................... 17

VII.   SULFURIC ACID EMISSIONS ............................................................ 19

   A.   Sulfuric Acid Emission Rates and Controls ..................................... 19

   B.   Sulfuric Acid Stack Testing Requirements ...................................... 20

   C.   Reagent Injection Compliance Curve ............................................... 21

   D.   Recordkeeping ............................................................................... 22

VIII.  ALLOWANCE SURRENDER REQUIREMENTS ..................................... 22

   A.   Use and Surrender of $NO_X$ and $SO_2$ Allowances ............................... 22

   B.   Method for Surrender of $NO_X$ and $SO_2$ Allowances .......................... 23

IX.    SUPER-COMPLIANT $NO_X$ AND $SO_2$ ALLOWANCES ........................... 25

X.     PROHIBITION ON NETTING CREDITS OR OFFSETS ........................... 25

XI.    ENVIRONMENTAL MITIGATION PROJECT ...................................... 26

XII.   CIVIL PENALTY ............................................................................... 28

XIII.  SECTION 162(F)(2)(A)(II) IDENTIFICATION ..................................... 29

XIV.   STATE-ONLY ENVIRONMENTALLY BENEFICIAL PROJECT ............ 30

XV.    RESOLUTION OF CIVIL CLAIMS ...................................................... 32

XVI.   PERIODIC REPORTING ..................................................................... 34

XVII.      REVIEW AND APPROVAL OF SUBMITTALS ........................................................ 36

XVIII.     STIPULATED PENALTIES ........................................................................................ 37

XIX.       FORCE MAJEURE ..................................................................................................... 45

XX.        DISPUTE RESOLUTION ........................................................................................... 48

XXI.       PERMITS ...................................................................................................................... 50

XXII.      INFORMATION COLLECTION AND RETENTION ................................................ 52

XXIII.     NOTICES ...................................................................................................................... 54

XXIV.      SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS ..... 55

XXV.       RETENTION OF JURISDICTION ............................................................................. 56

XXVI.      MODIFICATION ......................................................................................................... 57

XXVII.     GENERAL PROVISIONS ........................................................................................... 57

XXVIII.    SIGNATORIES AND SERVICE ................................................................................. 59

XXIX.      PUBLIC COMMENT/AGENCY REVIEW ................................................................ 59

XXX.       TERMINATION ........................................................................................................... 60

XXXI.      FINAL JUDGMENT .................................................................................................... 61

WHEREAS, Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff, the State of Indiana, by the authority of the Attorney General of Indiana, acting at the request of the Indiana Department of Environmental Management ("IDEM") (collectively, "Plaintiffs"), are filing with this Consent Decree a Complaint for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Clean Air Act ("the Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, and 326 Indiana Administrative Code ("IAC") Sections 2 and 5, alleging that Defendant, Indianapolis Power & Light Company ("IPL" or "Defendant"), has violated the Prevention of Significant Deterioration ("PSD") provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, the Nonattainment New Source Review ("NNSR") requirements of the Act, 42 U.S.C. §§ 7501-7515, the New Source Performance Standards ("NSPS") of the Act, 42 U.S.C. § 7411, the requirements of Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally enforceable Indiana State Implementation Plan ("Indiana SIP");

WHEREAS, EPA issued an Notice of Violation ("NOV") to IPL on September 29, 2009, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), alleging violations of the Act at several IPL plants, including the Petersburg Generating Station ("Petersburg Station").  The relevant violations alleged at the Petersburg Station include:

(a)      the PSD provisions in Part C of Subchapter I of the Act, 42 U.S.C. § 7475, 40 C.F.R. § 52.21;

(b)      Title V of the Act, 42 U.S.C. §§ 7661-7661f; and

(c)      the federally enforceable Indiana SIP, including 326 IAC 2-2-2(c) and 2-7;

1

WHEREAS, EPA issued an NOV to IPL on September 23, 2015, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), alleging violations of the Act at the Petersburg Station, including:

(a)     the NSPS at 42 U.S.C. § 7411 and 40 C.F.R. §§ 60.42(a)(2);

(b)     the federally enforceable Indiana SIP, including 326 IAC 5-1-2; and

(c)     the Indiana Department of Environmental Management ("IDEM") Title V Operating Permit, Section C.2;

WHEREAS, EPA issued an NOV to IPL on February 5, 2016, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), alleging violations of the Act at the Petersburg Station, including:

(a)     the PSD provisions in Part C of Subchapter I of the Act, 42 U.S.C. § 7475, 40 C.F.R. § 52.21;

(b)     the NNSR requirements in Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515;

(c)     Title V of the Act, 42 U.S.C. §§ 7661-7661f;

(d)     the NSPS at 42 U.S.C. § 7411 and 40 C.F.R. §§ 60.42(a)(2) and 60.43(a)(2); and

(e)     the federally enforceable Indiana SIP, including 326 IAC 2-2-2(c), 2-2-8(b), 2-3 and 5-1-2;

WHEREAS, the United States provided IPL and the State of Indiana actual notice of the alleged violations and commencement of the action, in accordance with Section 113 of the Act, 42 U.S.C. § 7413;

WHEREAS, in the Complaint, Plaintiffs allege, *inter alia,* that IPL modified units at the Petersburg Station and failed to obtain the necessary permits and install the controls necessary under the Act to reduce sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_X$"), particulate matter

("PM") and/or sulfuric acid mist emissions, that such emissions damage human health and the environment, and that, as a result of Defendant's actions, Defendant violated and continues to violate the PSD provisions of the Act, 42 U.S.C. § 7475 and the NNSR provisions of the Act, 42 U.S.C. §§ 7501-7515;

WHEREAS, in the Complaint, Plaintiffs allege, *inter alia,* that IPL violated and continues to violate the Indiana SIP, the NSPS and/or its Title V Permit by exceeding opacity limitations and emitting $SO_2$ and/or PM in excess of the applicable opacity limits;

WHEREAS, Plaintiffs' Complaint alleges claims upon which relief can be granted against IPL under Sections 113, 165, and 167 of the Act, 42 U.S.C. §§ 7413, 7475, and 7477;

WHEREAS, IPL has denied and continues to deny the violations alleged in the Complaint and the NOVs, and maintains that it has been and remains in compliance with the Act, federal implementing regulations and Indiana air regulations and statutes, including the Indiana SIP, and that it is not liable for civil penalties, injunctive or other relief, and states that it is agreeing to the obligations imposed by this Decree solely to avoid the costs and uncertainties of litigation and to improve the environment;

WHEREAS, the Defendant has cooperated in the resolution of these matters;

WHEREAS, Plaintiffs anticipate that the installation and operation of pollution control equipment pursuant to this Consent Decree will achieve significant reductions of $SO_2$, $NO_X$, and/or PM emissions and improve air quality; and

WHEREAS, Plaintiffs and the Defendant (collectively "the Parties," and each, individually, a Party) have agreed, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arms' length; that this settlement is fair, reasonable, in the best interest of the Parties and the public, and is consistent with the goals of the

Act and the Indiana SIP; and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter;

NOW, THEREFORE, without any admission by the Defendant, and without adjudication of or admission with respect to the violations alleged in the Complaint or the NOVs, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.    **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).

2.      Solely for the purposes of this Consent Decree and the underlying Complaint, Defendant waives all objections and defenses that it may have to the Court's jurisdiction over Defendant and to venue in this District.  Defendant consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## II.   **APPLICABILITY**

3.      Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Plaintiffs, the United States, including EPA, and the State of Indiana, including IDEM, and upon IPL, its successors and assigns, or other entities or persons otherwise bound by law.

4.      IPL shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to all vendors, suppliers, consultants, contractors, agents, and any other companies or organizations retained to perform any of the work required by this Consent Decree. Notwithstanding any retention of contractors, subcontractors, or agents to perform any work

required under this Consent Decree, IPL shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, IPL shall not assert as a defense the failure of its officers, directors, employees, agents, or contractors to take actions necessary to comply with this Consent Decree, unless IPL establishes that such failure resulted from a Force Majeure Event, as defined in Section XIX (Force Majeure) of this Consent Decree.

## III.   **DEFINITIONS**

5.     Every term expressly defined by this Section shall have the meaning given that term herein.  Every other term used in this Consent Decree that is also a term used under the Act or in a federal regulation implementing the Act shall mean in this Consent Decree what such term means under the Act or those regulations.

a.     A "30-Day Rolling Average Emission Rate" for a Unit shall be expressed as lbs/mmBTU and calculated in accordance with the following procedure:  first, sum the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous twenty-nine (29) Operating Days, with such emissions being determined from data derived from CEMS installed and operated at the Unit; second, sum the total heat input to the Unit in mmBTU during the Operating Day and the previous twenty-nine (29) Operating Days; and third, divide the total number of pounds of the pollutant emitted during the thirty (30) Operating Days by the total heat input during the thirty (30) Operating Days.  A new 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day.  Each 30-Day Rolling Average Emission Rate shall include all emissions that occur during all periods within an Operating Day, including emissions from startup, shutdown, and Malfunction.

b.       "Annual Tonnage Limitation" means the limitation on the number of tons of the pollutant ($SO_2$ or $NO_X$) that may be emitted from Units 1 through 4 at the Petersburg Station during the relevant calendar year (*i.e.,* January 1 through December 31), and shall include all emissions of the pollutant during all periods of operations, including startup, shutdown and Malfunction.

c.       "Baghouse" means a full stream (fabric filter) particulate emissions control device.

d.       "CEMS" or "Continuous Emission Monitoring System" means, for obligations involving the monitoring of $NO_X$ and $SO_2$ emissions and stack gas volumetric flow rate under this Consent Decree, the devices defined in 40 C.F.R.§ 72.2.

e.       "Clean Air Act" and "the Act" mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

f.       "Consent Decree" and "Decree" mean this Consent Decree, including Appendix A, which is hereto incorporated into this Consent Decree.

g.       "Continuous Operation" and "Continuously Operate" mean that when a pollution control technology or combustion control is required to be used at a Unit pursuant to this Consent Decree (including, but not limited to, a Baghouse, ESP, FGD system, LNB, OFA, Selective Catalytic Reduction device, Selective Non-Catalytic Reduction device and Sulfuric Acid Mitigation System), it shall be operated at all times that the Unit it serves is in operation, consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit.

6

h.      "Date of Entry" means the date this Consent Decree is signed or otherwise approved in writing by the District Court Judge for the United States District Court for the Southern District of Indiana.

i.      "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of Indiana.

j.      "Day" means calendar Day unless otherwise specified in this Consent Decree.

k.      "Defendant" means the Indianapolis Power & Light Company or "IPL."

l.      "Emission Rate" means the number of pounds of pollutant emitted per million British thermal units of heat input ("lbs/mmBTU"), measured in accordance with this Consent Decree.

m.      "EPA" means the United States Environmental Protection Agency.

n.      "ESP" and "Electrostatic Precipitator" mean a device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

o.      "Flue Gas Desulfurization System" and "FGD" mean an air pollution control device that removes sulfur compounds from a flue gas stream, including an absorber or absorbers utilizing lime, limestone, or a sodium-based slurry, for the reduction of sulfur dioxide emissions.

p.       "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, fuel oil, and natural gas.

q.      "Indiana SIP" means the Indiana state implementation plan approved and enforceable by EPA under Section 110 of the Act.

r.      "IPL" means the Indianapolis Power & Light Company.

s.      "lbs/mmBTU" means pounds of a pollutant per million British thermal units of heat input.

t.      "Low $NO_X$ Burner," or "LNB" means combustion modification technology that minimizes $NO_X$ formation by introducing coal and combusting air into a boiler such that initial combustion occurs in a manner that promotes rapid coal de-volatilization in a fuel-rich (i.e. oxygen deficient) environment and introduces additional air to achieve a final fuel-lean (i.e. oxygen rich) environment to complete the combustion processes.

u.      "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

v.      "MW" means a megawatt or one million watts.

w.      "National Ambient Air Quality Standards" and "NAAQS" mean the national ambient air quality standards that are promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

x.      "New Source Performance Standard" and "NSPS" mean the standard of performance for new stationary sources air quality program under Part A, Subchapter I of the Act, 42 U.S.C. § 7411, and 40 C.F.R. Part 60.

y.    "Nonattainment New Source Review" and "Nonattainment NSR" mean the nonattainment area NSR program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and 40 C.F.R. Part 51, as well as any Nonattainment NSR provisions of the Indiana SIP.

z.    "NOVs" means collectively and only to the extent each applies to the Petersburg Station: (i) February 5, 2016 Notice and Finding of Violation issued by EPA to Indianapolis Power and Light Company, (ii) September 23, 2015 Notice and Finding of Violation issued by EPA to Indianapolis Power and Light Company, (iii) and September 29, 2009 Notice and Finding of Violation issued by EPA to Indianapolis Power & Light Company.

aa.    "$NO_X$" means oxides of nitrogen.

bb.    "$NO_X$ Allowance" means an authorization to emit a specified amount of $NO_X$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or the Indiana SIP; provided, however, that  with respect to any such program that first applies to emissions occurring after December 31, 2018, a "$NO_X$ Allowance" shall include an allowance created and allocated under such program only for control periods starting on or after the first anniversary of the Date of Entry of this Consent Decree.

cc.    "Over- Fired Air" and "OFA" mean an in-furnace staged combustion control to reduce $NO_X$ emissions.

dd.    "Operating Day" means any calendar day during which a Unit fires Fossil Fuel.

9

ee.     "Operational or Ownership Interest" means part or all of IPL's legal or equitable operational or ownership interest in any Unit at the Petersburg Station.

ff.      "Parties" means the United States, including the EPA and the United States Department of Justice, the State of Indiana, including the Indiana Attorney General and IDEM, and IPL.

gg.    "Petersburg Station" means, for purposes of this Consent Decree, only the four coal-fired Units designated as Petersburg Unit 1 (229 MW$_{net}$), Petersburg Unit 2 (412 MW$_{net}$), Petersburg Unit 3 (540 MW$_{net}$) and Petersburg Unit 4 (530 MW$_{net}$) and located near Petersburg, Indiana.

hh.    "Plaintiff(s)" means the United States, including the EPA and the United States Department of Justice, and the State of Indiana, including the Indiana Attorney General and IDEM.

ii.      "PM" means particulate matter.

jj.     "PM Continuous Emission Monitoring System" and "PM CEMS" mean the equipment that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic record of PM emissions.

kk.    "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input ("lbs/mmBTU").

ll.      "PSD" means Prevention of Significant Deterioration program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, and 40 C.F.R. Part 52, as well as any PSD provisions of the Indiana SIP.

mm.    "Retire" means to permanently shut down and cease to operate the Unit, and to comply with applicable state and federal requirements for permanently ceasing

10

operation of the Unit, including removing the Unit from Indiana's air emissions inventory, and amending all applicable permits so as to reflect the permanent shutdown status of such Unit.

nn.   "Selective Catalytic Reduction System" or "SCR" means an air pollution control device for reducing NOx emissions in which ammonia ($NH_3$) is added to the flue gas stream and then passed through layers of a catalyst material.  The ammonia and NOx in the flue gas stream react on the surface of the catalyst, forming nitrogen ($N_2$) and water vapor.

oo.   "Selective Non-Catalytic Reduction System" or "SNCR" means an air pollution control process for the reduction of $NO_X$ emissions through the injection of ammonia or urea into the flue gas stream.

pp.   "$SO_2$" means sulfur dioxide.

qq.   "$SO_2$ Allowance" means an authorization to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or the Indiana SIP; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2018, an "$SO_2$ Allowance" shall include an allowance created and allocated under such program only for control periods starting on or after the first anniversary of the Date of Entry of this Consent Decree.

rr.   "State" means the State of Indiana, including but not limited to the Indiana Department of Environmental Management and the Indiana Attorney General.

ss.   "Sulfuric Acid Emission Rate" means the rate of sulfuric acid vapor or mist (including sulfur trioxide) emitted in lbs/mmBTU, in terms of $H_2SO_4$.

11

tt.     "Sulfuric Acid Mitigation System" means a sulfuric acid control system consisting of the injection of a reagent into the flue gas stream to react with the acid gases and reduce the outlet Sulfuric Acid Emissions Rate.

uu.     "Surrender" means permanently surrendering $NO_X$ or $SO_2$ Allowances from the accounts administered by U.S. EPA and the State of Indiana, if applicable, so that such $NO_X$ or $SO_2$ Allowances can never be used thereafter to meet any compliance requirement under the Clean Air Act, the Indiana SIP, or this Consent Decree.

vv.     "Title V Permit" means the permit required for the Petersburg Station's major sources under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

ww.     "Unit" means, collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment, at or serving a coal-fired steam electric generating unit.  An electric steam generating station may comprise one or more Units.

## IV.    $NO_X$ EMISSIONS

### A.  $NO_X$ Emission Rates and Controls

6.     By no later than July 1, 2023, IPL shall install an SNCR at Unit 4 at the Petersburg Station.

7.     If IPL Retires Units 1 and 2 before the SNCR is scheduled to be installed pursuant to Paragraph 6 above, IPL is released from the obligation set forth in Paragraph 6 above and the Unit 4 SNCR 30-Day Rolling Average $NO_x$ Emission Rate set forth in Paragraph 8, Table 1, below.

12

8.      Commencing on the dates set forth in Table 1 below and continuing thereafter, IPL shall Continuously Operate the $NO_X$ control technologies listed below at each Unit at the Petersburg Station at all times the Unit is operating and shall achieve and maintain the 30-Day Rolling Average Emission Rate as set forth in Table 1, below by the dates specified.

**Table 1:  $NO_X$ Emission Rates, Controls and Compliance Dates**

| Unit | Control Technology | 30-Day Rolling Average Emission Rate (lbs/mmBTU) | Date required to meet 30-Day Rolling Average Emission Rate |
|---|---|---|---|
| Unit 1 | LNB/OFA | 0.220 | 45 Days after Signature |
| Unit 2 | LNB/OFA/SCR | 0.100 | 45 Days after Signature |
| Unit 3 | SCR | 0.100 | 45 Days after Signature |
| Unit 4 | LNB/OFA | 0.260 | Date of Entry |
| | SNCR | 0.190 | July 1, 2023 |

9.      During any 30-Day period used to calculate a 30-Day Rolling Average Emission Rate for $NO_X$ for Petersburg Unit 2 or Unit 3, if either Unit requires operation of such Unit(s) at a load level that results in flue gas temperature so low that it becomes technically infeasible to Continuously Operate the SCR despite IPL's best efforts to do so (including, but not limited to, maintaining minimum load operation which provides for achieving sufficient inlet temperatures for injection of ammonia to the SCR), then IPL shall meet an alternative 30-Day Rolling Average Emission Rate for $NO_X$ of 0.110 lbs/mmBTU provided that, within 14 days of such event, IPL provides EPA and IDEM with:

a.      detailed data and calculations to demonstrate that, but for such low load operation, IPL would have achieved and maintained a 30-Day Rolling Average Emission Rate for $NO_X$ of no greater than 0.100 lbs/mmBTU at such Unit(s); and

b.      a description of IPL's efforts to minimize NOx emissions during this period.

## B. Annual Tonnage Limitation for $NO_X$

10.     Commencing in calendar year 2019, IPL shall operate the coal-fired Units 1 through 4 at Petersburg Station so the Units combined do not emit NOx in excess of an Annual Tonnage Limitation of 9,000 tons per year.

11.     Commencing in calendar year 2021 and continuing thereafter, IPL shall operate the coal-fired Units 1 through 4 at Petersburg Station so the Units combined do not emit $NO_X$ in excess of an Annual Tonnage Limitation of 8,500 tons per year.

## C. Monitoring of $NO_X$ Emissions

12.     In determining a 30-Day Rolling Average Emission Rate for $NO_X$, IPL shall use NOx emissions data obtained from a CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to such determinations.  Diluent capping (i.e., 5% $CO_2$) will be applied to the NOx emission rate for any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1.

13.      For purposes of calculating the Annual Tonnage Limitation for $NO_X$, IPL shall use CEMS in accordance with the procedures specified in 40 C.F.R. Part 75 with the modifications in Paragraph 12.

## V.      SO₂ EMISSIONS

## A. SO₂ Emission Rates and Controls

14.     Commencing on the dates set forth in Table 2 below and continuing thereafter, IPL shall Continuously Operate the wet FGDs at each Unit at the Petersburg Station at all times

the Unit is operating and shall achieve and maintain the 30-Day Rolling Average Emission Rate

as set forth in Table 2, below by the dates specified.

**Table 2:  SO₂ Emission Rates, Controls, and Compliance Dates**

| Unit | Control Technology | 30-Day Rolling Average Emission Rate (lbs/mmBTU) | Date required to meet 30-Day Rolling Average Emission Rate |
|------|-------------------|--------------------------------------------------|-----------------------------------------------------------|
| Unit 1 | wet FGD | 0.090 | 45 Days after Signature |
| Unit 2 | wet FGD | 0.090 | 45 Days after Signature |
| Unit 3 | wet FGD | 0.230 | 45 Days after Signature |
| Unit 4 | wet FGD | 0.210 | 45 Days after Signature |

**B.  Annual Tonnage Limitation for SO₂**

15.    Commencing in calendar year 2019 and continuing thereafter, IPL shall operate

the coal-fired Units 1 through 4 at the Petersburg Station so the Units combined do not emit $SO_2$

in excess of an Annual Tonnage Limitation of 10,100 tons per year.

**C.  Monitoring of SO₂ Emissions**

16.    In determining a 30-Day Rolling Average Emission Rate for $SO_2$, IPL shall use

$SO_2$ emissions data obtained from a CEMS in accordance with the procedures of 40 C.F.R. Part

75, except that the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply to

such determinations.  Diluent capping (i.e., 5% $CO_2$) will be applied to the $SO_2$ emission rate for

any hours where the measured $CO_2$ concentration is less than 5% following the procedures in 40

C.F.R. Part 75, Appendix F, Section 3.3.4.1.

17.     For purposes of calculating any Annual Tonnage Limitation for $SO_2$, IPL shall use CEMS in accordance with the procedures specified in 40 C.F.R. Part 75, with the modifications in Paragraph 16.

## VI.   PM EMISSIONS

### A.  Optimization of PM Emission Controls

18.     Commencing on the Date of Entry and continuing thereafter, IPL shall Continuously Operate the ESPs or Baghouses on each Unit at the Petersburg Station, as applicable and as listed below under Control Technology in Table 3, in a manner consistent with good air pollution control practice for minimizing PM emissions at all times when the Unit is in operation.  Except as required during correlation testing under 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Quality Assurance Requirements under Appendix F, Procedure 2, as required by this Consent Decree, IPL shall, at a minimum, ensure that to the extent reasonably practicable: (a) each section of the ESP for each unit is fully energized and each compartment of each Baghouse at each Unit remains operational, (b) the automatic control systems on each ESP at each Unit are operated to maximize PM collection efficiency; (c) the power levels delivered to each ESP at each Unit are maintained, where applicable, consistent with manufacturers' specifications, the operational design of the Unit, and good engineering practices; (d) ESP casings, ductwork and expansion joints in each Unit are inspected and repaired during the next planned Unit outage (or unplanned outage of sufficient length) to minimize air leakage; (e) the plate-cleaning and discharge-electrode-cleaning systems for each ESP at each Unit is optimized by varying the cycle time, cycle frequency, rapper-vibrator intensity, and number of strikes per cleaning event; and (f) for each such Unit with one or more

Baghouses, a bag leak detection program is developed and implemented to ensure that leaking bags are promptly replaced.

**B.  PM Emission Rates and Controls**

19.      Commencing on the Date of Entry and continuing thereafter, IPL shall achieve and maintain the filterable PM Emission Rate as set forth in Table 3, below.

**Table 3:  PM Emission Rates and Controls**

| Unit | Control Technology | Emission Rate (lbs/mmBtu) |
|------|--------------------|---------------------------|
| Unit 1 | ESP | 0.030 |
| Unit 2 | Baghouse | 0.015 |
| Unit 3 | Baghouse | 0.015 |
| Unit 4 | ESP | 0.030 |

**C.  PM Emissions Testing and Monitoring Requirements**

20.      Within six (6) months after the Date of Entry of this Decree and continuing in each calendar year thereafter, IPL shall conduct a stack test on each Unit at the Petersburg Station.  IPL may seek EPA's approval pursuant to Section XVII (Review and Approval of Submittals) of this Consent Decree to forego filterable PM stack testing and instead demonstrate compliance with an applicable filterable PM Emission Rate using CEMS on a 3-hour rolling average emission rate basis.

21.      To determine compliance with the filterable PM Emission Rate established in Paragraph 19 above, IPL shall use the method as specified in 40 C.F.R. Part 63, Subpart UUUUU, Table 5(1)(e) (filterable portion only) or a PM stack testing method specified in and allowed by applicable Indiana SIP provision(s), unless EPA approves a request to demonstrate

17

continuous compliance with a filterable PM Emission Rate using PM CEMS under the preceding Paragraph 20.  Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction.  The sampling time for each run shall be at least 60 minutes and the volume of each run shall be at least 0.85 dry standard cubic meters (30 dry standard cubic feet).  IPL shall calculate the PM Emission Rate from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of each PM stack test shall be submitted to EPA and IDEM within sixty (60) Days following completion of such test.

22.     Commencing in the first full calendar year after the Date of Entry of the Decree, and continuing in each calendar year thereafter, IPL shall conduct a PM stack test for condensable PM on each Unit at the Petersburg Station using the reference methods and procedures set forth at 40 C.F.R. Part 51, Appendix M, EPA Method 202.  Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction.  The sampling time for each run shall be at least 60 minutes and the volume of each run shall be at least 0.85 dry standard cubic meters (30 dry standard cubic feet).  IPL shall calculate the number of pounds of condensable PM emitted per million BTU of heat input (lb/mmBTU) from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of the PM stack test conducted pursuant to this Paragraph shall not be used for the purpose of determining compliance with the PM Emission Rates required by this Consent Decree.  The results of each PM stack test shall be submitted to EPA and IDEM within sixty (60) Days following completion of such test.

23.     IPL may perform filterable and condensable PM testing every other year, rather than every year, provided that the two most recently completed stack test results conducted in

accordance with the methods and procedures specified in this Consent Decree demonstrate that the filterable PM emissions are equal to or less than 0.015 lb/mmBTU for those Units with an Electrostatic Precipitator and 0.0075 lb/mmBTU for those Units with a Baghouse.  IPL shall perform testing every year, rather than every other year, beginning in the year immediately following any test result demonstrating that the filterable PM emissions are greater than 0.015 lb/mmBTU for those Units with an Electrostatic Precipitator or 0.0075 lb/mmBTU for those Units with a Baghouse.

24.     Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (Feb. 24, 1997)) concerning the use of data for any purpose under the Act.

**VII.    SULFURIC ACID EMISSIONS**

**A.  Sulfuric Acid Emission Rates and Controls**

25.     Commencing thirty (30) days after the Date of Entry and continuing thereafter, IPL shall Continuously Operate the Sulfuric Acid Mitigation System at each Unit at the Petersburg Station at all times the unit is operating.

26.     Commencing within nine (9) months after the Date of Entry and continuing thereafter, IPL shall achieve and maintain the Sulfuric Acid Emission Rates as set forth in Table 4 below.

27.      To determine compliance with the Sulfuric Acid Emissions Rates in Table 4, IPL shall conduct stack testing in accordance with Subsection B below.

**Table 4:  Sulfuric Acid Emission Rates**

| Unit | Unit Emission Rate (lbs/mmBTU) |
|------|-------------------------------|
| Unit 1 | 0.008 |
| Unit 2 | 0.007 |
| Unit 3 | 0.007 |
| Unit 4 | 0.008 |

**B.  Sulfuric Acid Stack Testing Requirements**

28.     Within nine (9) months after the Date of Entry of this Consent Decree and in each calendar year thereafter, IPL shall conduct a stack test for sulfuric acid on each unit at the Petersburg Station.

29.     In conducting the stack test, IPL shall use the reference methods and procedures specified in 40 C.F.R. Part 60, Appendix A-4, EPA Conditional Test Method (CTM) 013 with ion chromatography or an alternative reference method or procedure requested by IPL and approved by EPA in accordance with Section XVII (Review and Approval of Submittals).  Each stack test shall be conducted isokinetically at a location in the stack where the gas velocity is average and the sampling rate is the same approximate linear velocity as the gas going up the stack.  IPL must verify that the stack configuration is such that stack flue gases are not stratified at the sampling location.  If stack flue gases are stratified, then IPL must consider and propose an alternative test methodology to be approved by EPA.

30.     At least ninety (90) Days prior to conducting the first Sulfuric Acid stack test, IPL shall submit a test protocol (using EPA GD-042) to EPA for approval pursuant to Section XVII (Review and Approval of Submittals) identifying: (1) the date the test is scheduled to occur; (2)

the proposed testing methodologies to be utilized; (3) the Unit operating loads proposed for the high, mid, and low load ranges; (4) the anticipated reagent injection rates/locations and the basis for such rates/locations; and (5) other operating conditions expected to be utilized for the testing (including, but not limited to, flue gas temperature at probe, flue gas temperature at air heater, and efforts made to maintain sampling line at correct temperature).  All stack tests shall be conducted pursuant to a protocol submitted and approved under this Paragraph, except as provided for in Paragraph 31, below.

31.    If IPL elects to conduct a stack test under a protocol different from a protocol previously submitted under Paragraph 30 and approved by EPA, then within ninety (90) Days prior to conducting such stack test, IPL shall submit a new protocol to EPA for approval pursuant to Section XVII (Review and Approval of Submittals) identifying the enumerated items in Paragraph 30, above.  All stack tests shall be conducted while the SCR is operating (if the unit has an SCR installed).

32.    The results of each stack test shall be reported in lbs/mmBTU in terms of $H_2SO_4$ and ppmvd and consist of three separate runs each performed under the approved protocol.  The flow rates shall also be reported with the results of each test.  IPL shall calculate the Sulfuric Acid Emissions Rate from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of each sulfuric acid stack test shall be submitted to EPA and IDEM within sixty (60) Days of completion of each test.

**C.  Reagent Injection Compliance Curve**

33.    Within sixty (60) Days after the completion of each sulfuric acid stack test under this Decree IPL shall develop a Sulfuric Acid Mitigation System Reagent Injection Compliance Curve that corresponds to the reagent and reagent injection rates utilized during the last

successfully demonstrated compliant stack test, and include such curve as part of the stack test report submitted in accordance with Paragraph 32 above.

34.     After completing the requirements of Paragraph 33, at all times that each unit at the Petersburg Station is in operation, IPL shall maintain a level at or above the reagent concentration (e.g., molar ratio) and reagent injection rate (based on a 24-hour rolling average injection rate) that corresponds to the operating load on the Reagent Injection Compliance Curve developed in Paragraph 33.

35.      If at any time IPL makes a material change to either (a) the configuration of the Sulfuric Acid Mitigation System or (b) the associated injected reagent(s), and that change causes a material reduction in the removal efficiency of the Sulfuric Acid Mitigation System, then IPL shall conduct a stack test, in accordance with Subsection B above, within sixty (60) Operating Days after it completes the change, and comply with the provisions of this Subsection C.

**D.  Recordkeeping**

36.     IPL shall maintain a daily record of the reagent injection rates utilized at each Unit.  The record shall include the following information: (1) date; (2) average daily unit load (MWg); (3) average daily reagent injection flow rate (gallons per minute and tons per hour); and (4) reagent injection density (if injecting liquid reagent).

**VIII.     ALLOWANCE SURRENDER REQUIREMENTS**

**A.     Use and Surrender of $NO_X$ and $SO_2$ Allowances**

37.     Except as may be necessary to comply with Section XVIII (Stipulated Penalties) of this Consent Decree, IPL shall not use $NO_X$ or $SO_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required

by this Consent Decree by using, tendering, or otherwise applying $NO_X$ or $SO_2$ Allowances to offset any excess emissions.

38.     Except as provided in this Consent Decree, beginning in calendar year 2019 and continuing each calendar year thereafter, IPL shall not sell, bank, trade, or transfer its interest in any $NO_X$ or $SO_2$ Allowances allocated to any coal-fired Unit at the Petersburg Station.

39.     Beginning in calendar year 2019, and continuing each calendar year thereafter, IPL shall Surrender all $NO_X$ and $SO_2$ Allowances allocated to any coal-fired Unit at Petersburg Station for that calendar year that IPL does not need to meet federal and/or state Clean Air Act regulatory requirements either for that Unit or any other coal-fired Units at Petersburg Station.

40.     Nothing in this Consent Decree shall prevent IPL from purchasing, transferring or otherwise obtaining $NO_X$ or $SO_2$ Allowances from another source for purposes of complying with federal and/or state Clean Air Act regulatory requirements to the extent otherwise allowed by law.

41.     The requirements of this Consent Decree pertaining to IPL's use and Surrender of $NO_X$ and $SO_2$ Allowances are permanent and are not subject to any termination provision of this Consent Decree.

**B.     Method for Surrender of $NO_X$ and $SO_2$ Allowances**

42.     IPL shall Surrender, or transfer to a non-profit third-party selected by IPL for Surrender, all $NO_X$ and $SO_2$ Allowances required to be Surrendered pursuant to this Section by June 30 of the immediately following calendar year.

43.     If any Allowances required to be Surrendered under this Consent Decree are transferred directly to a non-profit third-party, IPL shall include a description of such transfer in the next report submitted to U.S. EPA pursuant to Section XVI (Periodic Reporting) of this

Consent Decree.  Such report shall: (a) identify the non-profit third-party recipient(s) of the Allowances and list the serial numbers of the transferred Allowances; and (b) include a certification by the third-party recipient(s) stating that the recipient(s) will not sell, trade, or otherwise exchange any of the Allowances and will not use any of the Allowances to meet any obligation imposed by any environmental law.  No later than the third periodic report due after the transfer of any Allowances, IPL shall include a statement that the third-party recipient(s) Surrendered the Allowances for permanent Surrender to U.S. EPA in accordance with the provisions of Paragraph 44 below within one-year after the IPL transferred the Allowances to them.  IPL shall not have complied with the Allowance Surrender requirements of this Paragraph until all third-party recipient(s) have actually Surrendered the transferred Allowances to U.S. EPA.

44.     For all Allowances required to be Surrendered, IPL shall, with respect to the Allowances that IPL is to Surrender, ensure that an Allowance transfer request form is first submitted to U.S. EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such Allowances to the EPA Enforcement Surrender Account or to any other U.S. EPA account that U.S. EPA may direct in writing.  Such Allowance transfer requests may be made in an electronic manner using the U.S. EPA's Clean Air Markets Division Business System, or similar system provided by U.S. EPA.  As part of submitting these transfer requests, IPL shall ensure that the transfer of its Allowances are irrevocably authorized and that the source and location of the Allowances being Surrendered are identified by name of account and any applicable serial or other identification numbers or station names.

## IX.        SUPER-COMPLIANT NO$_X$ AND SO$_2$ ALLOWANCES

45.     Notwithstanding Section VIII.A (Use and Surrender of NOx and SO$_2$ Allowances) of this Consent Decree, in each calendar year beginning in 2019, and continuing thereafter, IPL may sell, bank, use, trade, or transfer Petersburg Station Units 2 and 3 NOx Allowances and Petersburg Station Units 1 and 2 SO$_2$ Allowances made available in that calendar year solely as a result of (a) the installation and operation of any NOx or SO$_2$ air pollution control equipment that is not otherwise required by, or necessary to maintain compliance with, any provision of this Consent Decree, and is not otherwise required by law or (b) the achievement and maintenance of an Emission Rate below the 30-Day Rolling Average NOx Emission Rate or 30-Day Rolling Average SO2 Emission Rate, as applicable to the Allowances being used, provided that IPL is also in compliance for that calendar year with all emission limitations for NOx or SO$_2$, as applicable to whether NOx or SO$_2$ Allowances are being used, as set forth in this Consent Decree.

46.     IPL shall timely report the generation of such Super-Compliant NOx or SO$_2$ Allowances in accordance with Section XVI (Periodic Reporting) of this Consent Decree.

## X.        PROHIBITION ON NETTING CREDITS OR OFFSETS

47.     Emission reductions that result from actions to be taken by IPL after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a Netting credit or offset under the Clean Air Act's Nonattainment NSR and PSD programs.

48.     The limitations on the generation and use of netting credits and offsets set forth in the previous Paragraph do not apply to emission reductions achieved at Petersburg Station Unit 1, Unit 2, Unit 3, or Unit 4 that are greater than those required for that particular Unit under this

Consent Decree. For purposes of this Paragraph, emission reductions at Petersburg Station Unit 1, Unit 2, Unit 3 and/or Unit 4 are greater than those required under this Consent Decree if they result from such Unit's compliance with federally-enforceable emission limits that are more stringent than those limits imposed on such Unit under this Consent Decree and under applicable provisions of the Clean Air Act or the Indiana SIP.

49.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the applicable state regulatory agency or EPA for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## XI.     ENVIRONMENTAL MITIGATION PROJECT

50.     IPL shall implement the Environmental Mitigation Project ("Project") described in Appendix A to this Consent Decree in compliance with the approved plans and schedules for such Project and other terms of this Consent Decree.

51.     IPL shall maintain, and present to EPA and IDEM upon request, all documents necessary to substantiate the completion of the Project described in Appendix A and shall provide these documents to EPA within thirty (30) Days following a request for the documents.

52.     All plans and reports prepared by IPL pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA and IDEM shall be publicly available from IPL without charge in paper or electronic format.

53.     With respect to the Project, IPL certifies the truth and accuracy of each of the following:

      a.     That, as of the date of executing this Decree, IPL is not required to perform or develop the Project by any federal, state, or local law or regulation and is not required to perform or develop the Project by agreement, grant, or as injunctive relief awarded in any other action in any forum;

      b.     That the Project is not a Project that IPL was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

      c.     That IPL has not received and will not receive credit for the Project in any other enforcement action; and

      d.     That IPL shall neither generate nor use any pollutant reductions from the Project as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

54.     IPL shall use good faith efforts to secure as much environmental benefit as possible for the Project, consistent with the applicable requirements and limits of this Consent Decree.

55.     IPL shall comply with the reporting requirements described in Appendix A.

56.     Beginning with the first Periodic Report under this Consent Decree, and continuing until completion of the Project (including any applicable periods of demonstration or testing), IPL shall provide EPA and IDEM with semi-annual updates concerning the progress of the Project.

57.     In the first Periodic Report following the completion of the Project required under this Consent Decree (including any applicable periods of demonstration or testing), IPL shall submit to EPA and IDEM a report that documents the date that the Project was completed, IPL's

results from implementing the Project, including the emission reductions or other environmental benefits achieved.

## XII.  <u>CIVIL PENALTY</u>

58.  Within thirty (30) Days after the Date of Entry of this Consent Decree, IPL shall pay to the United States and the State of Indiana a civil penalty in the amount of $1.525 million, as follows:

a.  IPL shall pay a civil penalty of $925,000 to the United States.  The civil penalty to the United States shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing DOJ Case Number 90-5-2-1-09897 and the civil action case name and case number of this action.  The costs of such EFT shall be IPL's responsibility.  Payment shall be made in accordance with timely instructions provided to IPL by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern District of Indiana.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, IPL shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XXIII (Notices) of this Consent Decree.

b.  IPL shall pay a civil penalty of $600,000 to the State of Indiana within thirty (30) Days after the Date of Entry.  Payment shall be wired through an EFT to Indiana to be deposited to the Environmental Management Special Fund pursuant to IC 13-14-12-1. To receive wire instructions, Defendants shall call or email the following point of contact:

Robin Champion
Accounts Receivable Manager
Indiana Department of Environmental Management
Phone: 317-233-2394
Email: RChampio@idem.IN.gov

Defendants shall also notify the same point of contact within ten (10) Days after the transfer occurs to confirm receipt.

59.     Failure to timely pay the civil penalty shall subject IPL to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render IPL liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States or the State of Indiana in securing payment.

## XIII.     __SECTION 162(F)(2)(A)(II) IDENTIFICATION__

60.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 4; Section IV (NOx Emissions), Paragraphs 6 – 13; Section V (SO₂ Emissions), Paragraphs 14 – 17; Section VI (PM Emissions), Paragraphs  18– 24; Section VII (Sulfuric Acid Emissions), Paragraphs 25 – 36; Section VIII (Allowance Surrender Requirements), Paragraphs 37 -- 39, 41 – 44;  Section XI (Environmental Mitigation Project), Paragraphs 50 – 57 and Appendix A; Section XVI (Periodic Reporting), Paragraphs 74 (except with respect to the State EBP), 75 – 76; Section XVII (Review and Approval of Submissions), Paragraphs 77 (except with respect to dispute resolution) -- 78; Section XXI (Permits), Paragraphs 103 --107; and Section XXII (Information Collection and Retention), Paragraphs 108 – 109, is restitution or required to come into compliance with law.

29

## XIV.     STATE-ONLY ENVIRONMENTALLY BENEFICIAL PROJECT

61.     In consideration of the State of Indiana's agreement to the terms of this settlement, IPL has agreed to perform a State-Only Environmentally Beneficial Project ("State EBP") in accordance with this Section and the provisions of Appendix B for acquisition/donation (and, if appropriate, restoration) of ecologically significant land in the vicinity of the Petersburg Station for the benefit of the citizens of the State of Indiana and which will provide environmental benefits to residents in the vicinity of the Petersburg Station.

62.     IPL shall spend at least, but shall have no obligation to spend more than, $325,000 in performing its obligations for completion of the State EBP.

63.     Certification.  For the State EBP, IPL certifies as follows:

   a.     That, as of the date of executing this Decree, IPL is not required to perform or develop the State EBP by any federal, state or local law or regulation and is not required to perform or develop the State EBP by agreement, grant, or as injunctive relief awarded in any other action in any forum.

   b.     That IPL was not planning to perform the State EBP other than in settlement of claims resolved in this Decree.

   c.     IPL has not received and will not receive credit for the State EBP in any other enforcement action.

64.     IPL shall submit a final State EBP Completion Report, including a summary of all expenditures and any additional information required pursuant to Appendix B, to IDEM (with an information only copy to EPA) no later than one-hundred and eighty (180) Days from the date of the State EBP's completion. The State EBP Completion Report must be certified by an appropriate corporate official and shall contain:

30

a. a detailed description of the project as completed, including a general description of properties and a map that clearly identifies the location of the ecologically significant land relative to IPL's Petersburg Station;

b. a breakdown of all project costs associated with the acquisition/donation and, if appropriate, restoration of the ecologically significant land;

c. evidence of the State EBP completion (which may include, but is not limited to, photos, vendor invoices or receipts, correspondence, etc.); and

d. A certification stating:

I certify that the project has been fully implemented pursuant to the provisions of the consent decree entered in United States of America and The State of Indiana v. Indianapolis Power and Light Company, [insert cause], that I am familiar with the information in this document and that, based on my inquiry of those individuals responsible for obtaining the information, it is true and complete to the best of my knowledge. I know that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations.

65. Following receipt of the State EBP Completion Report, within sixty (60) Days, IDEM will notify IPL in writing that:

a. IPL has satisfactorily completed the State EBP and the State  EBP Completion Report, or

b. IPL has not satisfactorily completed the State EBP and/or the State EBP Completion Report, and state the reasons for IDEM's determination.

66. IPL is responsible for the satisfactory completion of the State EBP as provided in this Consent Decree.

a. If IPL completes work pursuant to the State EBP Project as set forth in Appendix B but is unable to spend the entire amount specified in Paragraph 62 despite IPL's good faith efforts, then IPL shall, following consultation with and approval by

31

IDEM, use the remainder of its monetary obligation to help fund restoration of the acquired/donated ecologically significant land.

b.      Except as provided in Paragraph 66(a) above, if IPL fails to implement the State EBP, or halts or abandons work on the State EBP, IPL shall pay a stipulated penalty to the State of Indiana in the manner set forth in Paragraph 58 b) above, equal to the difference between the amount in Paragraph 62 above and the amount expended as demonstrated in the certified cost reports in satisfactory performance of the State EBP, plus $20,000.  The penalty under this Paragraph shall accrue as of the date specified for completing the State EBP or the date performance ceases, whichever is earlier.

67.    IDEM's determinations under this Section XIV shall be subject to Dispute Resolution (Section XX) under this Decree.

## XV.    RESOLUTION OF CIVIL CLAIMS

68.    This Consent Decree resolves all civil claims of the United States and the State of Indiana against IPL for the violations alleged in the Complaint filed in this action through the Date of Lodging.   This Consent Decree also resolves all civil claims regarding the Petersburg Station alleged in the NOVs issued by EPA to IPL under any or all of: (a) Opacity and $SO_2$ requirements in the IPL Title V Permit, including Sections C.2, D.1.2, D.2.2.(a)(2), D.2.2(b)(2), and D.2.3(a) of the IPL Title V Permit, (b) Opacity requirements in NSPS Subpart D, including at 40 C.F.R. §  60.42(a)(2), (c) the $SO_2$ limits in NSPS Subpart D, including at 40 C.F.R. §  60.43(a)(2) and (d) Opacity and $SO_2$ requirements in the Indiana SIP, including at 326 IAC 12, 326 IAC 5-1, et seq.  This Consent Decree also resolves all civil claims of the United States and the State of Indiana against IPL that arose from any modifications commenced before the Date of Lodging at a Petersburg Station Unit, including but not limited to those claims

32

alleged in the Complaint in this action and NOVs issued by EPA to IPL, only to the extent each applies to the Petersburg Station, under any or all of: (a) Part C or D of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing PSD and Nonattainment NSR provisions of the Indiana SIP (b) Section 111 of the Clean Air Act, 42 U.S.C. § 7411 and 40 C.F.R. §  60.14; and (c)Title V of the Act, 42 U.S.C. §§ 7661-7661f, including regulations that EPA has promulgated or approved under Title V of the Act, but only to the extent that such Title V claims are based on IPL's failure to obtain an operating permit that reflects applicable requirements imposed under Section 111 or Part C or D of Subchapter I of the Act.

69.     The United States and the State of Indiana reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 68.  This Consent Decree shall not be construed to limit the rights of the United States or Indiana to obtain penalties or injunctive relief under the Act, its implementing regulations, or regulations authorized by the Act, or under other federal or state laws, regulations, or permit conditions except as specifically stated in Paragraph 68.  The United States and Indiana further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or the environment arising at, or posed by, the Petersburg Station, whether or not related to the violations addressed in this Consent Decree or otherwise.

70.     In any subsequent administrative or judicial proceeding initiated by the United States or Indiana for injunctive relief, civil penalties, or other appropriate relief relating to the Petersburg Station, IPL shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or Indiana in the subsequent proceeding were or should have been brought in the instant

case, except with respect to claims that have been resolved pursuant to Paragraph 68.  This

Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local

laws or regulations.  IPL is responsible for achieving and maintaining complete compliance with

all applicable federal, State, and local laws, regulations, and permits; and IPL's compliance with

this Consent Decree shall be no defense to any action commenced pursuant to any such laws,

regulations, or permits, except as set forth herein.  The United States and Indiana do not, by their

consent to the entry of this Consent Decree, warrant or aver in any manner that IPL's compliance

with any aspect of this Consent Decree will result in compliance with the provisions of the Act,

or with any other provisions of federal, State, or local laws, regulations, or permits.

71.     This Decree does not limit or affect the rights of the United States or Indiana

against any third parties not party to this Consent Decree.

72.     This Decree shall not create any rights in, or grant any cause of action to, any third

party not party to this Consent Decree.

73.     This Consent Decree does not apply to any claim(s) of alleged criminal liability.

## XVI.     PERIODIC REPORTING

74.     Beginning 90 Days after Entry of this Consent Decree, on either the following

January 30 or July 30 (whichever comes first) and continuing on a semi-annual basis, i.e.,

January 30 and July 30, until termination of this Consent Decree, and in addition to any other

express reporting requirement in this Consent Decree, IPL shall submit to EPA and IDEM a

periodic report containing the following information:

a.     all information necessary to determine compliance with the requirements

contained in Section IV ($NO_X$ Emissions), Section V ($SO_2$ Emissions), Section VI (PM

Emissions), Section VII (Sulfuric Acid Emissions), and Section VIII (Allowance Surrender Requirements);

      b.    all information (including supporting calculations) relating to Super-Compliant $NO_X$ and $SO_2$ Allowances that IPL claims to have generated in accordance with Section IX (Super-Compliant $NO_X$ and $SO_2$ Allowances) through compliance beyond the requirements of this Consent Decree;

      c.    all information indicating the status of installation and commencement of operation of pollution controls, including information that the installation and commencement of operation of a pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by IPL to mitigate such delay;

      d.    an identification of all periods when any pollution control device required by this Consent Decree to Continuously Operate was not operating, the reason(s) for the equipment not operating, and the basis for IPL's compliance or non-compliance with the Continuous Operation requirements of this Consent Decree; and

      e.    a summary of actions implemented and expenditures (cumulative and in the current reporting period) made pursuant to implementation of the Environmental Mitigation Project and State EBP required pursuant to Sections XI, XIV, Appendix A and Appendix B.

75.    In any periodic report submitted pursuant to this Section, IPL may incorporate by reference information under its Title V permitting requirements, provided that IPL attaches the Title V permit report, or the relevant portion thereof, and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic report.

76.     In addition to the periodic reports required pursuant to this Section, if IPL violates or deviates from any emission rate or any annual tonnage limitation requirement of this Consent Decree, IPL shall submit to EPA and IDEM a report on the violation or deviation from such requirement within twenty-one (21) Days after IPL knew or should have known of the event by exercise of due diligence.  In the report, IPL shall explain the cause or causes of the violation or deviation and any measures taken or to be taken by IPL to cure the reported violation or deviation or to prevent such violation or deviation in the future.  If at any time, the requirements of this Consent Decree are included in Title V Permits, consistent with the requirements for such inclusion in this Consent Decree, then the submittal to EPA and IDEM of deviation reports required under applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.  Each IPL report required by this Consent Decree shall be signed by IPL's Clean Air Act Title V Responsible Official, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my evaluation, or the directions and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.  I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## XVII.    REVIEW AND APPROVAL OF SUBMITTALS

77.     Defendant shall submit each plan, report, or other submission required by this Consent Decree to Plaintiffs whenever and in the manner such a document is required to be submitted for review or approval pursuant to this Consent Decree. EPA (after consultation with the State) may approve the submission or decline to approve it and provide written comments explaining the bases for declining such approval as soon as reasonably practicable. Within 60 Days of receiving written comments from EPA, Defendant shall either: (a) revise the submission

consistent with the written comments and provide the revised submission to EPA; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XX (Dispute Resolution) of this Consent Decree.

78.     Upon receipt of EPA's final approval of the submission, or upon completion of the submission pursuant to dispute resolution, Defendant shall implement the approved submission in accordance with the schedule specified therein or another EPA-approved schedule.

## XVIII.     <u>STIPULATED PENALTIES</u>

79.     For any failure by IPL to comply with the terms of this Consent Decree, and subject to the provisions of Sections XIX (Force Majeure) and XX (Dispute Resolution), IPL shall pay, within thirty (30) Days after receipt of written demand to IPL by the United States, the following stipulated penalties to the United States and Indiana:

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a.   Failure to pay the civil penalty as specified in Section XII (Civil Penalty) of this Consent Decree. | $10,000 per Day |
| b.   Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or $NO_X$, where the violation is less than 5% in excess of the lbs/mmBTU limits. | $2,500 per Day per violation |
| c.   Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or $NO_X$, where the violation is equal to or greater than 5% but less than 10% in excess of the lbs/mmBTU limits. | $5,000 per Day per violation |
| d.   Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or $NO_X$, where the violation is equal to or greater than 10% in excess of the lbs/mmBTU limits. | $10,000 per Day per violation |

| | |
|---|---|
| e.   Failure to comply with the Annual System Tonnage Limits for $SO_2$. | $5,000 per ton for the first 100 tons, and $10,000 per ton for each additional ton above 100 tons.  In addition, IPL shall Surrender $SO_2$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded |
| f.   Failure to comply with the Annual System Tonnage Limits for $NO_X$. | $5,000 per ton for the first 100 tons, and $10,000 per ton for each additional ton above 100 tons.  In addition, IPL shall Surrender $NO_X$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded. |
| g.   Failure to install, commence Continuous Operation, or Continuously Operate a $NO_X$, $SO_2$, or PM control device or the Sulfuric Acid Mitigation System as required by this Consent Decree. | $10,000 per day per violation during the first 30 Days, $37,500 per Day per violation thereafter |
| h.   Failure to conduct any performance tests required by this Consent Decree. | $1,000 per Day per violation |
| i.   Failure to apply for any permit, or amendment or application thereto, required by Section XXI (Permits). | $1,000 per Day per violation |
| j.   Failure to timely submit or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree. | $750 per Day per violation during the first ten days, $1,000 per day per violation thereafter |
| k.   Using, selling, banking, trading, or transferring $NO_X$ or $SO_2$ Allowances except as permitted by Section VIII (Allowance Surrender Requirements). | The Surrender of Allowances in an amount equal to four times the number of Allowances used, sold, or transferred in violation of this Consent Decree |
| l.   Failure to Surrender $NO_X$ or $SO_2$ Allowances as required under this Consent Decree. | (a) $37,500 per Day plus (b) $1,000 per Allowance not surrendered |
| m.  Failure to demonstrate the third-party Surrender of a $NO_X$ or $SO_2$ Allowance in accordance with Section VIII (Allowance Surrender Requirements). | $2,500 per Day per violation |

| | |
|---|---|
| n.   Failure to undertake and complete any of the Environmental Mitigation Projects in compliance with Section XI (Environmental Mitigation Project) of this Consent Decree. | $1,000 per Day per violation during the first 30 days, $5,000 per Day per violation thereafter |
| o.   Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Section VI (PM Emissions) where the violation is less than 5% in excess of the limit set forth in this Consent Decree. | $2,500 per Day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| p.   Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Section VI  (PM Emissions) where the violation is equal to or greater than 5% but less than 10% in excess of the limit set forth in this Consent Decree. | $5,000 per Day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| q.   Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Section VI (PM Emissions) where the violation is equal to or greater than 10% in excess of the limit set forth in this Consent Decree. | $10,000 per Day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate |
| r.   Failure to optimize an ESP or Baghouse pursuant to Paragraph 18 | $1,000 per Day |
| s.   Violating an applicable Sulfuric Acid Emission Rate based on the results of a stack test required pursuant to Section VII (Sulfuric Acid Emissions) where the violation is less than 5% in excess of the limit set forth in this Consent Decree. | $2,500 per Day per violation |
| t.   Violating an applicable Sulfuric Acid Emission Rate based on the results of a stack test required pursuant to Section VII (Sulfuric Acid Emissions) where the violation is equal to or greater than 5% but less than 10% in excess of the limit set forth in this Consent Decree. | $5,000 per Day per violation |

| u.   Violating an applicable Sulfuric Acid Emission Rate based on the results of a stack test required pursuant to Section VII (Sulfuric Acid Emissions) where the violation is equal to or greater than 10% in excess of the limit set forth in this Consent Decree. | $10,000 per Day per violation |
|---|---|
| v.   Failure to maintain a 24-hour rolling average injection rate in accordance with Paragraph 34. | $1,000 per Day per violation with no more than one stipulated penalty assessed per Unit per Day |
| w.  Any other violation of this Consent Decree. | $1,000 per Day per violation |

80.     Violations of any limit based on a 30-Day Rolling Average constitute thirty (30) days of violation, but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than thirty (30) Operating Days, IPL shall not be obligated to pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

81.      Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Malfunctions.

a.       If any Petersburg Station Unit exceeds a unit-specific 24-Hour or 30-Day Rolling Average Emission Rate due to Malfunction, IPL, bearing the burden of proof, has an affirmative defense to stipulated penalties under this Consent Decree if IPL satisfies the following:  i) the excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond the control of the Defendant; ii) the excess emissions (1) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (2) could not have been avoided by better operation and maintenance practices in accordance with manufacturers' specifications and good engineering and maintenance practices; iii) to the maximum extent practicable, the air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for

40

minimizing emissions in accordance with manufacturers' specifications and good

engineering and maintenance practices; vi) repairs were made in an expeditious fashion

when Defendant knew or should have known that an applicable 24-Hour or 30-Day

Rolling Average Emission Rate was being or would be exceeded. Off-shift labor and

overtime must have been  utilized, to the extent practicable, to ensure that such repairs

were made as  expeditiously as practicable;  v) the amount and duration of the excess

emissions were minimized to the maximum extent practicable during periods of such

emissions in accordance with manufacturers' specifications and good engineering and

maintenance practices; vi) all possible steps were taken to minimize the impact of the

excess emissions on ambient air quality; vii) all emission monitoring systems were kept

in operation if at all possible in accordance with manufacturers' specifications and good

engineering and maintenance practices; viii) Defendant's actions in response to the

excess emissions were documented by properly signed or otherwise validated,

contemporaneous operating logs, or other relevant evidence; ix)  the excess emissions

were not part of a recurring pattern indicative of inadequate design, operation, or

maintenance; and x) Defendant properly and promptly notified Plaintiffs as required by

this Consent Decree.

      b.     To assert an affirmative defense for exceedance of an applicable 24-Hour

Rolling Emission Rate due to Malfunction under Paragraph 81(a), the Defendant shall

submit all data demonstrating the actual emissions for any 24 hour period during which

the excess emissions from the Malfunction occurs.   To assert an affirmative defense for

exceedance of an applicable 30-Day Rolling Average Emission Rate due to a

Malfunction under Paragraph 81(a), IPL shall submit all data demonstrating the actual

emissions for the Day the Malfunction occurs and the 29-Day period following the Day the Malfunction occurs.  Defendant may, if it elects, submit emissions data for the same 24-Hour or 30-Day period but that excludes the excess emissions.

c.      IPL shall provide notice to the United States in writing of IPL's intent to assert an affirmative defense as to stipulated penalties for a Malfunction under this Paragraph 81(a) in IPL's semiannual progress reports as required by Section XVI (Periodic Reporting).  This notice shall be submitted to EPA pursuant to the provisions of Section XXIII (Notices). The notice shall contain: i) The identity of each stack or other emission point where the excess emissions occurred;  ii) The magnitude of the excess emissions expressed in the units of the applicable emissions limitation and the operating data and calculations used in determining the magnitude of the excess emissions; iii) The time and duration or expected duration of the excess emissions;  iv) The identity of the equipment from which the excess emissions emanated; v)  The nature and suspected cause of the excess emissions;  vi)  The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunction; and  vii) The steps that were or are being taken to limit the excess emissions.

d.      A Malfunction shall not constitute a Force Majeure Event unless the Malfunction also meets the definition of a Force Majeure Event, as provided in Section XIX (Force Majeure).

e.      The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

82.    All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

83.    Within thirty (30) Days following receipt of written demand to IPL from the United States, IPL shall pay one-half of the amount of stipulated penalties to the United States and one-half to the State of Indiana, and shall continue to make such payments every thirty (30) Days thereafter until the violation(s) no longer continues, unless IPL elects within twenty (20) Days of receipt of written demand to IPL from the United States to dispute the obligation to pay or the accrual of stipulated penalties in accordance with the provisions in Section XX (Dispute Resolution) of this Consent Decree.

84.    Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 81 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.    If the dispute is resolved by agreement, or by a decision of Plaintiffs pursuant to Section  XX (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) Days of the Date of Entry of the agreement or of the receipt of Plaintiffs' decision;

b.    If the dispute is appealed to the Court and Plaintiffs prevail in whole or in part, IPL shall, within sixty (60) Days of receipt of the Court's decision or order, pay all

accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in subparagraph (c) of this Paragraph; or

c.      If the Court's decision is appealed by any Party, IPL shall, within fifteen (15) Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owed, together with interest accrued on such stipulated penalties determined to be owed by the appellate court.

85.     The United States or the State of Indiana may in the unreviewable exercise of its discretion reduce or waive stipulated penalties otherwise due to it under this Consent Decree.

86.     All monetary stipulated penalties shall be paid in the manner set forth in Section XII (Civil Penalty) of this Consent Decree and all Allowance Surrender stipulated penalties shall comply with the Allowance Surrender procedures of Paragraphs 42 through 44.

87.     Should IPL fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States and the State of Indiana shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State of Indiana from seeking any remedy otherwise provided by law for IPL's failure to pay any stipulated penalties.

88.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State of Indiana by reason of IPL's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of this Consent Decree (for which this Consent Decree provides for payment of a stipulated penalty) that is also a violation of the Act, including the implementing

Title V operating permit program, regulations EPA has approved and/or promulgated under the Act, the Indiana SIP, including Indiana regulations under 326 IAC Article 2, or of an operable Title V permit, IPL shall be allowed a credit for stipulated penalties paid against any statutory or regulatory penalties also imposed for such violation.

## XIX.    **FORCE MAJEURE**

89.     For purposes of this Consent Decree, "Force majeure," is defined as any event arising from causes beyond the control of IPL, of any entity controlled by IPL, or of IPL's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite IPL's best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure Event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) after it has occurred, such that the delay and/or violation are minimized to the greatest extent possible.  "Force Majeure" does not include IPL's financial inability to perform any obligation under this Consent Decree.

90.     Notice of Force Majeure Events.  If any event occurs or has occurred that may delay or prevent compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which IPL intends to assert a claim of Force Majeure, then IPL shall notify the United States in writing as soon as practicable, but in no event later than twenty-one (21) Days following the date IPL first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.  In this notice, IPL shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the Force Majeure Event, all measures taken or to be taken by IPL to prevent or minimize the delay or violation, the schedule by which IPL

proposes to implement those measures, and IPL's rationale for attributing the failure, delay, or violation to a Force Majeure Event.  A copy of this Notice shall be sent electronically, as soon as practicable, to the United States.  IPL shall adopt all reasonable measures to avoid or minimize such failures, delays, or violations.  IPL shall be deemed to know of any circumstance which it, its contractors, or any entity controlled by it, knew or should have known.

91.     Failure to Give Notice.  If IPL fails to comply with the notice requirements of this Section, the United States (after consultation with the State of Indiana) may void IPL's claim for Force Majeure as to the specific event for which IPL has failed to comply with such notice requirement.

92.     United States' Response.  The United States shall notify IPL in writing regarding IPL's claim of Force Majeure as soon as reasonably practicable after receipt of the Notice required under Paragraph 90.  If the United States (after consultation with the State of Indiana) agrees that a delay in performance has been or will be caused by a Force Majeure Event, the United States and IPL shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event, or as otherwise agreed to by the United States (after consultation with the State of Indiana) and IPL, in which case the delay at issue shall be deemed not to be a violation of the affected requirement(s) of this Consent Decree.  In such circumstances, an appropriate modification shall be made pursuant to Section XXVI (Modification) of this Consent Decree.

93.     Disagreement.  If the United States (after consultation with the State of Indiana) does not agree with IPL's claim of Force Majeure, or if the United States and IPL cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XX (Dispute Resolution) of this Consent Decree.

94.     Burden of Proof.  In any dispute regarding Force Majeure, IPL shall bear the burden of proving that any delay in performance, or any other violation of any requirement of this Consent Decree, was caused by or will be caused by a Force Majeure Event.  IPL shall also bear the burden of proving that IPL gave the notice required by this Section and the anticipated duration and extent of any failure, delay, or violation(s) attributable to a Force Majeure Event. An extension of one compliance date may, but will not necessarily, result in an extension of a subsequent compliance date.

95.     Events Excluded.  Unanticipated or increased costs or expenses associated with the performance of IPL's obligations under this Consent Decree shall not constitute a Force Majeure Event.

96.     Potential Force Majeure Events.  The Parties agree that, depending upon the circumstances related to an event and IPL's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; unanticipated coal supply or pollution control reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization (e.g., the Midcontinent Independent System Operator, Inc.), acting under and authorized by applicable law or tariff as accepted by the Federal Energy Regulatory Commission, that directs IPL to supply electricity so long as such order is a response to a system-wide (state-wide or regional) emergency which could include unanticipated required operation to avoid loss of load or unserved load or is necessary to preserve the reliability of the bulk power system.  Depending upon the circumstances and IPL's response to such circumstances, failure of a permitting authority or the Indiana Utility

Regulatory Commission ("IURC") to issue a necessary permit, approval or order with sufficient time for IPL to achieve compliance with this Consent Decree may constitute a Force Majeure Event where the failure of the permitting authority or the IURC to act is beyond the control of IPL and IPL has taken all steps available to it to obtain the necessary permit or order, including, but not limited to: submitting a complete permit application or request; responding to requests for additional information by the permitting authority or the IURC in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority or the IURC.

97.     Extended Schedule.  As part of the resolution of any matter submitted to this Court under Section XX (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the United States and IPL by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work and/or obligations under this Consent Decree to account for the delay in the work and/or obligations that occurred as a result of any delay agreed to by the United States or approved by the Court.  IPL shall be liable for stipulated penalties pursuant to Section XVIII (Stipulated Penalties) of this Consent Decree for its failure thereafter to complete the work and/or obligations in accordance with the extended or modified schedule (provided that IPL shall not be precluded from asserting that a further Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule).

## XX.    DISPUTE RESOLUTION

98.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when IPL sends the United States (or the State, in a dispute concerning the State EBP) a written Notice of Dispute.  The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement of the Parties.  If the Parties cannot resolve a dispute by informal negotiations, then the United States (or the State, in a dispute concerning the State EBP) shall provide IPL with a written summary of its position regarding the dispute within 30 Days following the conclusion of the period for informal negotiations.  The position advanced by the United States (or the State, in a dispute concerning the State EBP) shall be considered binding unless, within 45 Days after the United States (or the State, in a dispute concerning the State EBP)  provides its written position, IPL seeks judicial resolution of the dispute as set forth below.

99.     IPL may seek judicial resolution of the dispute by filing with the Court and serving on the United States and the State in accordance with Section XXIII (Notices) a motion requesting judicial resolution of the dispute.  The motion shall contain a written statement of IPL's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.  This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section or the Parties' inability to reach agreement.

100.   The United States (or the State, in a dispute concerning the State EBP) shall respond to IPL's motion within the time period allowed by the Local Rules of this Court. IPL may file a reply memorandum, to the extent permitted by the Local Rules.

101.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of IPL under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 84.  If IPL does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XVIII (Stipulated Penalties).    The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their filings with the Court under Paragraph 99, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XXI.    **PERMITS**

102.    Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires IPL to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under State law, IPL shall make such application in a timely manner. EPA and the State of Indiana will use best efforts to review expeditiously, to the extent applicable, all permit applications submitted by IPL to meet the requirements of this Consent Decree.

Nothing in this Consent Decree shall be construed to require Defendant to apply for, amend, or obtain a PSD or Nonattainment NSR permit or permit modification for any physical change in, or any change in the method of operation of, any Unit that would give rise to claims resolved by Section XV(Resolution of Civil Claims) of this Consent Decree.

103.   When permits are required to comply with the terms of this Consent Decree, IPL shall complete and submit applications for such permits to the applicable State or local agency to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the applicable State or local agency.  Any failure by IPL to submit a timely permit application for a Unit, as required by permitting requirements under state, local, and/or federal regulations, shall bar any use of Section XIX (Force Majeure) of this Consent Decree where a Force Majeure claim is based on permitting delays.

104.   Within one-hundred eighty (180) Days after the Date of Entry of this Consent Decree, IPL shall apply for a modification of its Title V Permit, to include a schedule for all performance, operational, and control technology requirements established by this Consent Decree and: (a) all NOx, $SO_2$, PM, and Sulfuric Acid Emissions requirements contained in Sections IV, V, VI, and VII of this Consent Decree; (b) any pertinent and relevant definition contained in Section III and; (c) requirements pertaining to the Surrender of Allowances specified in Section VIII.  No other provisions of this Consent Decree shall be included as provisions of the permit modification pursuant to this Paragraph.

105.   Within one year from the Date of Entry of this Consent Decree, IPL shall apply pursuant to 326 IAC 2-7-10.5(b) to permanently include the requirements and limitations of this Consent Decree enumerated in this Paragraph into a federally-enforceable permit or request a site-specific amendment to the Indiana SIP, such that the requirements and limitations enumerated in this Paragraph become and remain "applicable requirements" as that term is defined in 40 C.F.R. Part 70.2.  The permit shall include:  (a) all NOx, $SO_2$, PM, and Sulfuric Acid Emissions Rates, Controls and Annual Tonnage Limitations for NOx and $SO_2$ contained in Sections IV, V, VI.B, and VII.A of this Consent Decree; (b) requirements to maintain

compliance with a reagent injection curve as provided for in Section VII.B and C of this Consent

Decree, unless IPL chooses or the permitting authority requires IPL to install a continuous

emissions monitor to monitor sulfuric acid emissions; notwithstanding the above, upon request

by IPL at any time, along with supporting data, IDEM may, in its discretion, agree to reduce the

frequency of stack testing required to establish the reagent injection curve; (c) any pertinent and

relevant definition in Section III (Definitions) and (d) requirements pertaining to the Surrender of

Allowances specified in Section VIII.  No other provisions of this Consent Decree shall be

included in the federally-enforceable non-Title V Permit or request for a site-specific amendment

to the Indiana SIP.  The provisions of this Consent Decree in Sections XVIII (Force Majeure)

and XVII (Affirmative Defenses as to Stipulated Penalties for Excess Emissions Occurring

During Malfunctions) are applicable to compliance with this Consent Decree only and shall not

be incorporated into any permits or approvals obtained in compliance with this Consent Decree.

106.    Such permit shall allow for submittals to be sent to IDEM in place of EPA upon

termination of this Consent Decree.

107.   IPL shall provide the United States with a copy of each application for a federally

enforceable permit or SIP amendment, as well as a copy of any permit or amendment proposed

as a result of such application, to allow for timely participation in any public comment

opportunity.

## XXII.    **INFORMATION COLLECTION AND RETENTION**

108.    Any authorized representative of the United States, including their attorneys,

contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the

premises of a Unit at the Petersburg Station at any reasonable time for the purpose of:

a.      monitoring the progress of activities required under this Consent Decree;

    b.      verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

    c.      obtaining samples and, upon request, splits of any samples taken by IPL or its representatives, contractors, or consultants; and

    d.      assessing IPL's compliance with this Consent Decree.

109.    Until three (3) years after termination of this Consent Decree, IPL shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) in its or its contractors' or agents' possession or control, and that directly relate to IPL's performance of its obligations under this Consent Decree.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.  At any time during this information-retention period, upon request by the United States or the State, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

110.    Defendant may assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2, and as to the State, as provided by Indiana law.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2, and as to the State, as provided by Indiana law.

111.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XXIII.     <u>NOTICES</u>

112.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in both paper and electronic format at the following addresses.  Electronic submittals shall not be the only form of notification, submission, or communication unless agreed upon by both the submitting and receiving parties.

<u>As to the United States of America:</u>

 (if by mail service)
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC  20044-7611
DJ# 90-5-2-1-09897/1


(if by commercial delivery service)
4 Constitution Square
150 M Street, NE
Suite 2.900
Washington, DC 20002
DJ# 90-5-2-1-09897/1

(if by email)
eescdcopy.enrd@usdoj.gov
DJ# 90-5-2-1-09897/1

and

Compliance Tracker
Air Enforcement and Compliance Assurance Branch
U.S. Environmental Protection Agency - Region 5
77 West Jackson Blvd. AE-18J
Chicago, Illinois 60604-3590

(and by email at)
r5ardreporting@epa.gov

As to State of Indiana:

Phil Perry
Indiana Department of Environmental Management
Chief, Air Compliance Branch
100 North Senate Avenue
MC-61-53, IGCN 1003
Indianapolis, Indiana 46204-2251

As to IPL:

General Counsel
Indianapolis Power and Light Co.
One Monument Circle
Indianapolis, IN 46204-2901

113.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

114.   Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXIV.    SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

115.   No sale or transfer of ownership or operational interest in any of the Units at the Petersburg Station, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented, unless (1) the transferee agrees to undertake all of the obligations required by this Consent Decree that may be applicable to the transferred or purchased ownership or operational interests, and to be substituted for IPL as a Party under the Decree as a "material change" modification pursuant to Section XXVI (Modification) as to the applicable requirements of this Consent Decree and thus be bound thereby, and (2) the United States, after consultation with the State, consents to relieve IPL of such obligations. The United States, after consultation with the State,

may refuse the transfer if it determines that the proposed transferee does not possess the technical ability or financial means required to implement the Decree.  At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer to the United States and the State, in accordance with Section XXIII (Notices).  Any attempt to transfer ownership or operational interest in any of the Units at the Petersburg Station without complying with this Paragraph constitutes a violation of this Decree.

116.    This Consent Decree shall not be construed to impede the transfer of any ownership or operational interests between IPL and any third party so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation as between IPL and any third party purchaser of ownership or operational interests of the burdens of compliance with this Consent Decree.

117.    IPL may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the transferred ownership or operational interests, including the obligations set forth in Sections IX (Environmental Mitigation Project), X (Civil Penalty) and XIV (State-Only EBP).

**XXV.    RETENTION OF JURISDICTION**

118.    The Court shall retain jurisdiction over this case after entry of this Consent Decree until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, or to effectuate or enforce compliance with the terms of this Decree.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXVI.    MODIFICATION

119.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the United States and IPL.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

120.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XX (Dispute Resolution), provided, however, that instead of the burden of proof provided by Paragraph 94, the Party seeking modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXVII.    GENERAL PROVISIONS

121.    When this Consent Decree specifies that IPL shall achieve and maintain a 30-Day Rolling Average Emission Rate, the Parties expressly recognize that compliance with such 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified and that compliance as of such specified date (e.g., December 31) shall be determined based on data from that date and the twenty-nine (29) prior Unit Operating Days.

122.    Nothing in this Consent Decree shall relieve IPL from its obligation to comply with all applicable federal, state, and local laws and regulations, including laws, regulations, and compliance deadlines that become applicable after the Date of Entry of the Consent Decree. Such laws and regulations include, but are not limited to, the Utility Mercury and Air Toxics Standards, the National Ambient Air Quality Standards, the Utility New Source Performance Standards requirements, and the obligation to apply for a Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permit(s) for the discharge of wastewater, and in connection with any such application or application for permit renewal, to provide the NPDES

permitting authority with all information necessary to appropriately characterize effluent from their operations and develop appropriate effluent limitations, including but not limited to all information necessary for the NPDES permitting authority to appropriately evaluate discharges of total dissolved solids for their operations. Nothing in this Consent Decree should be construed to provide any relief from the emission limits or deadlines specified in such regulations, including, but not limited to, deadlines for the installation of pollution controls required by any such regulations, nor shall this Decree be construed as a pre-determination of eligibility for the one-year extension that may be provided under 42 U.S.C. § 7412(i)(3)(B).

123. Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

124. Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101. IPL shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits. For example, if an actual Emission Rate is 0.1004, it shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, it shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100. IPL shall report data to the number of significant digits in which the standard or limit is expressed.

125. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject

matter herein.   Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

126.    IPL, the United States, and IDEM shall each bear its own costs and attorneys' fees, except that the Plaintiffs shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XXVIII.    SIGNATORIES AND SERVICE

127.    Each undersigned representative of IPL, IDEM, EPA and the Department of Justice, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

128.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

129.    Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIX.    PUBLIC COMMENT/AGENCY REVIEW

130.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

improper, or inadequate.  Defendant  agrees not to withdraw from or oppose entry of this

Consent Decree by the Court or challenge any provision of the Decree, unless the United States

has notified Defendant in writing that it no longer supports entry of the Decree.

**XXX.**      **TERMINATION**

131.   Once IPL has:

a.      completed the requirements of Sections IV (NOx Emissions), V (SO$_2$

Emissions), VI (PM Emissions), VII (Sulfuric Acid Emissions), XI (Environmental

Mitigation Project), and XIV(State-Only Environmentally Beneficial Project) of this

Consent Decree;

b.      maintained continuous compliance with this Consent Decree, including

continuous operation of all pollution controls required by this Consent Decree, for a

period of at least 24 months;

c.      paid the civil penalty and any accrued stipulated penalties as required by

this Consent Decree;

d.      either included the requirements and limitations enumerated in this

Consent Decree into a permanent federally enforceable permit or obtained a site-specific

amendment to the Indiana SIP, as required by Paragraph 105 in Section XXI (Permits) of

this Consent Decree; and

e.      certified that the date of IPL's Request for Termination is later than

December 31, 2022,

IPL may serve upon the United States a Request for Termination of this Consent Decree as a

whole, stating that IPL has satisfied all the requirements of this Paragraph, together with all

necessary supporting documentation.

132.    Following receipt by the United States of IPL's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether IPL has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with the State of Indiana, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

133.    If the United States, after consultation with the State of Indiana, does not agree that the Decree may be terminated, IPL may invoke Dispute Resolution under Section XX of this Decree.  However, IPL shall not seek Dispute Resolution of any dispute regarding termination until sixty (60) Days after service of its Request for Termination.

## XXXI.    **FINAL JUDGMENT**

134.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States, the State of Indiana and IPL.

SO ORDERED this 23rd day of March 2021.

Roger A.G. Sharpe, Clerk

BY: _____
Deputy Clerk, U.S. District Court

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Signature Page for *United States of America and the State of Indiana v. Indianapolis Power & Light Company* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE:

DATE: <u>August 7, 2020</u>        JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


<u>s/ Arnold S. Rosenthal</u>
ARNOLD S. ROSENTHAL
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice


SHELESE EMMONS WOODS
Civil Chief
Office of the United States Attorney
U.S. District Court for the Southern District of Indiana

Signature Page for *United States of America and the State of Indiana v. Indianapolis Power & Light Company* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

DATE: <u>August 18, 2020</u>

SUSAN BODINE
Digitally signed by SUSAN BODINE
Date: 2020.08.18
16:36:24 -04'00'

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and
  Compliance Assurance
U.S. Environmental Protection Agency


ROSEMARIE A. KELLEY
Director
Office of Civil Enforcement
U.S. Environmental Protection Agency


EVAN BELSER
Acting Director, Air Enforcement Division
U.S. Environmental Protection Agency


SABRINA ARGENTIERI
Attorney-Advisor
Air Enforcement Division
U.S. Environmental Protection Agency

Signature Page for *United States of America and the State of Indiana v. Indianapolis Power & Light Company* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

DATE: <u>August 20, 2020</u>　　　T. Leverett Nelson
　　　　　　　　　　　　　　　Digitally signed by T. Leverett Nelson
　　　　　　　　　　　　　　　Date: 2020.08.20 16:31:15 -05'00'
_____
T. LEVERETT NELSON
Regional Counsel
U.S. Environmental Protection Agency – Region 5


LOUISE GROSS
Associate Regional Counsel
U.S. Environmental Protection Agency – Region 5

Signature Page for *United States of America and the State of Indiana v. Indianapolis Power & Light Company,* Consent Decree

FOR THE STATE OF INDIANA:

DATE:  <u>August 21, 2020</u>              OFFICE OF THE INDIANA ATTORNEY GENERAL

ZACHARY D. PRICE
KELLY S. EARLS
Deputy Attorneys General

<u>s/Patricia Orloff Erdmann</u>
PATRICIA ORLOFF ERDMANN
Chief Counsel for Litigation
Office of the Indiana Attorney General
302 W. Washington Street, IGCS 5th Floor
Indianapolis, IN 46204

<u>s/Bruno L. Pigott</u>
BRUNO L. PIGOTT
Commissioner
Indiana Department of Environmental Management

ELIZABETH A. ZLATOS
Office of Legal Counsel
Indiana Department of Environmental Management

Signature Page for *United States of America and the State of Indiana v. Indianapolis Power & Light Company,* Consent Decree

FOR INDIANAPOLIS POWER & LIGHT COMPANY:

DATE: ___8/12/2020___

Judi L. Sobecki
Vice President, General Counsel and Secretary
Indianapolis Power & Light Company

66

**APPENDICES**

## APPENDIX A:  ENVIRONMENTAL MITIGATION PROJECT

I.       **Overall Schedule and Plan for Environmental Mitigation Project**

   A.       <u>Project Expenditures</u>: Defendant shall spend $5,000,000 in Project Dollars (Project Dollars), and shall comply with the requirements of this Appendix and with Section XI (Environmental Mitigation Project) of the Consent Decree, to implement and secure the environmental benefits of the Environmental Mitigation Project ("Project") that is described in Section II of this Appendix.  Nothing in this Decree or this Appendix shall require Defendant to spend any more than a total of $5,000,000 on the Project.

   B.       <u>Project Plan Submission</u>: Within one hundred eighty (180) days of the Date of Entry, Defendant shall submit a proposed plan ("Project Plan") for the Project specified in this Appendix to EPA for review and approval (with copy to IDEM) pursuant to Section XVII of the Consent Decree (Review and Approval of Submittals), for a Project in which IPL will construct and operate a system (System) that will be connected into the Petersburg Station auxiliary electrical system and that will provide a new, non-emitting source of power as set forth in Part II.A. below.

   C.       <u>Project Plan Requirements</u>: The proposed Project Plan shall include the following:
   1. A detailed proposal for the design of the Project;
   2. A detailed plan for implementing the Project;
   3. A summary-level budget for the Project;
   4. A time line for implementation of the Project; and
   5. A description of the anticipated environmental benefits of the Project including an estimate of emission reductions (e.g., $SO_2$, $NO_x$, and PM) expected to be realized.

   D.       <u>EPA Approval of Project Plan</u>: EPA (after consultation with IDEM) reserves the right to disapprove any Project should EPA determine, after an analysis of the Project Plan, that the Project does not conform to the requirements of Section XI and Appendix A of this Consent Decree.

   E.       <u>Project Completion Schedule</u>: Upon approval by EPA (after consultation with IDEM) of the Project Plan required by this Appendix, Defendant shall complete the approved Project according to the approved Project Plan.  Nothing in the Consent Decree shall be interpreted to prohibit Defendant from completing the Project ahead of schedule.

   F.       <u>Periodic Reporting</u>: Commencing with its first periodic report due pursuant to Section XVI (Periodic Reporting) of the Decree, and continuing semi-annually thereafter until completion of the Project, Defendant shall include in the periodic report information describing the progress of the Project, including the Project Dollars expended on the Project to date.

G.   <u>Request for EPA Approval of Project Completion</u>: In accordance with the requirements of Paragraph 57 of the Decree, after Completion of the Project, Defendant shall submit to EPA, for review and approval in accordance with Section XVII of the Consent Decree (with copy to IDEM), a request for approval of Defendant's Completion of the Project that documents:

1. The date Defendant completed the Project;
2. A demonstration that the Project has been installed and implemented as designed in the approved Project Plan;
3. The results of implementation of the Project, estimated emission reductions and/or other environmental benefits expected to be achieved; and
4. The Project Dollars expended by Defendant in implementing the Project.

H.   <u>EPA Approval of Project Completion</u>: If EPA (after consultation with IDEM) concludes based on the report documenting the Completion of the Project or subsequent information provided by Defendant that the Project has been performed and completed in accordance with the Decree, then EPA will approve Completion of the Project for purposes of the Decree.

I.   <u>Project Payment</u>: Unless otherwise specified by this Appendix, Defendant at its election may spread its payment for the Project over the period specified in Section II.H of this Appendix. Defendant may also accelerate its payments to better effectuate a Project Plan, but Defendant shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures. Any funds designated for the Project that are left unspent, or are projected to be left unspent, at the Project's completion may be redirected by Defendant, following consultation with and approval by EPA (after consultation with IDEM) to another Project.

## II.   Other Provisions

A. <u>Project Location, Capacity & Connectivity</u>: Defendant shall install the System at the Petersburg Station. At its discretion, Defendant may choose to install some or all of the System on top of one or more of the ash ponds to be closed at the Petersburg Station, once the capping of the ash pond(s) to be used in the System at the Petersburg Station is completed. Any proposal for installing the System on one or more of the capped ash ponds must be in accordance with State closure and post-closure requirements and approved by IDEM prior to initiating construction. The System shall have a rated nameplate capacity of 3.0 MW. The System shall be connected into the Petersburg Station auxiliary electrical system (with sufficient monitoring to record both the real-time and cumulative AC power output of the System) in order to provide power for the internal Petersburg Station load.

B. <u>Project Ownership, Operation, Maintenance & Term</u>: Defendant shall own, operate and maintain the System to serve the internal load at the Petersburg

Station for not less than 10 years (as measured from the day that power is first provided from the System; the "Initial 10 Years"). This obligation to operate and maintain the System shall continue after Completion of the Project and survive Termination of the Consent Decree. Defendant shall continue to own, operate and maintain the System for up to a total of 25 Years from the day that power is first provided from the System ("25 Year Period"), so long as the Petersburg Station is operating (i.e., producing electricity from fossil fuel), in order to serve the internal load at the Station. If the Petersburg Station is retired (i.e., no longer operating) after the Initial 10 Years but prior to the end of the 25 Year Period, then Defendant may but shall not be required to continue to operate and maintain the System; provided, however, that if Defendant does not continue to operate and maintain the System, Defendant shall use good faith efforts to ensure that the System is connected to the grid and that ownership is transferred to a third party who would thereafter assume sole responsibility to operate and maintain the System to provide energy for the remainder of the 25 Year Period.

C.  <u>Project Design and Construction</u>: Defendant may choose to design the System itself and may contract with third-party contractors to provide the System and construct the System.

D.  <u>Competitive Bidding</u>: Defendant shall, to the extent reasonable, use competitive solicitation and bidding processes to secure product and services (excluding design and project management) related to the construction of the System.

E.  <u>Project Dollar Calculation</u>: "Project Dollars" means IPL's expenditures and payments incurred or made in carrying out the Project identified in this Appendix A to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section XI and Appendix A of this Consent Decree, and (b) constitute IPL's direct payments for such Project, or IPL's external costs for contractors, vendors, and equipment, provided, however, that for the purposes of calculating Project Dollars, Project Dollars shall exclude the cost of any Project studies or feasibility analysis, the cost associated with closing and/or capping any ash ponds, and any current or projected maintenance or third-party management costs once the Project is connected to the Petersburg Station's auxiliary electrical system. In addition, Project Dollars shall reflect the difference between Defendant's cost in implementing the Project and any projected economic benefit to Defendant resulting from the sale of electricity and any savings from reduced fuel usage due to performance of the System for the duration of the Initial 10 Years, or during the 25 Year Period if Defendant continues to own and operate the System.

F.  <u>Use of RECs</u> : The Project shall be in addition to any other legal obligations, including Defendant's obligations under any state Renewable Portfolio Standard ("RPS"). Defendant shall keep and will retire any Renewable Energy Credits or Renewable Resource Credits (collectively RECs) generated by the System during the Initial 10 Years, or during the 25 Year Period if Defendant continues to own

and operate the System.  At no time during the Initial 10 Years, or during the 25 Year Period if Defendant continues to own and operate the System, shall the environmental attributes from this System be available for, sold to, used for or claimed by consumers in the voluntary market.

G.     <u>Use of RECs After Initial 10 Years</u>: Following the Initial 10 Years, or following the 25 Year Period during which Defendant continues to own and operate the System, Defendant will no longer be bound by the terms governing the Environmental Mitigation Project identified in Section XI of the Consent Decree and this Appendix, including but not limited to limitations on the use of RECs. RECs generated following the Initial 10 Years, or following the 25 Year Period during which Defendant continues to own and operate the System, may be used for any purpose authorized by law, including but not limited to satisfying regulatory requirements under any RPS standard or selling RECs for any purpose.

H.     <u>Completion of the Project Deadline</u>: Defendant shall achieve Completion of the Project no later than five years from the date EPA approves the Project Plan.

I.      <u>Satisfaction of Defendant's Obligations</u>: Once EPA (after consultation with IDEM) approves the report documenting Completion of the Project, Defendant shall have satisfied its obligation to implement the Environmental Mitigation Project under Section XI of the Decree, but Defendant's obligation to operate and maintain the System shall continue as provided in Section II.B of this Appendix

**APPENDIX B:**

**STATE-ONLY ENVIRONMENTALLY BENEFICIAL PROJECT**

IPL shall comply with the requirements of this Appendix in fulfilling its obligations under Section XIV of the Consent Decree with regard to the State-Only Environmentally Beneficial Project (Project).

### I. Project Purpose and Benefits

A. IDEM proposes this Project in response to concerns raised over the years by residents in the proximity of the IPL Petersburg Station about potential deforestation and the lack of restoration and/or preservation of ecologically significant parcels of land in the area (Ecologically Significant Lands). Such Ecologically Significant Lands, which border or are contiguous to the Patoka National Wildlife Refuge (Wildlife Refuge) include hundreds of acres of prior-converted farmland, upland forests, and bottomland forested wetlands. In addition, some of the surrounding area includes land previously used for mining and farming that could greatly benefit from ecological restoration. Much of the Ecologically Significant Lands is owned by willing sellers. Acquiring one or more of the Ecologically Significant Lands and donating it (or them) to the Wildlife Refuge will result in much needed ecological preservation and restoration of such lands and would be in accordance with the 15-year Wildlife Refuge Habitat Management Plan, which includes planting of native trees on acquired farmed wetlands as well as planting native grasses and wildflower forbs on acquired reclaimed mine-land upland farm fields.

B. IDEM has determined that restoration and preservation of the Ecologically Significant Lands, in accordance with the 15-year Wildlife Refuge Habitat Management Plan, will help ameliorate and restore past detrimental effects to plant life and vegetation in the vicinity that can be attributed to high levels of sulfur dioxide, ozone and PM 2.5 emissions. IDEM has further determined that the Project will help to prevent soil, nutrient and chemical runoff from agricultural use that can be deleterious to water quality not only in local adjacent creeks and the Patoka River but, because they ultimately flow into the Wabash River, the Wabash River as well. Therefore, the Project will likely reduce Indiana's contribution to Gulf of Mexico hypoxia. In addition to the obvious aesthetic benefits, restoration and preservation of the Ecologically Significant Lands is expected to benefit grassland nesting birds and pollinator insects such as the monarch butterfly. Additionally, the acquisition of existing forest land by the Wildlife Refuge will prevent the possibility of deforestation due to the sale of trees for timber harvest.

### II. Project Requirements

IPL shall spend at least, but shall have no obligation to spend more than, $325,000 in Project Dollars (as defined in this Appendix B) on the following Project:

A. Within 180 days from the Date of Entry, IPL, in consultation with Andrew Stinchfield or other designee of the IDEM Southwest Regional Office, shall commence

development of a plan (the Project Plan) for the acquisition and donation of one or more Ecologically Significant Lands bordering or contiguous to the Patoka National Wildlife Refuge.

B.     The Project Plan shall:

1.   to the extent practicable, prioritize land acquisition activity to qualifying tracts that are in closest proximity to the IPL Petersburg Station and are of the greatest ecological significance;
2.   provide that all land acquisition shall include the transfer of title of the qualifying tracts by means of donation for preservation of the land in perpetuity; provided that IPL shall not be required to become an owner of the land but may assign a purchase agreement for the property or may allow a nominee to acquire title and then convey the land;
3.   list the projected costs of acquiring and donating the land tracts (including administrative costs); and
4.   include a method and manner for the tracking of funds spent on land acquisition that lists the location and number of the acres purchased and the type of land tracts acquired for donation.

C.     The Project Plan may also allow a portion of Project Dollars that are spent for the purpose of land acquisition to be used to help fund restoration of the donated land, following consultation with and approval by IDEM.  Such restoration may include, but is not limited to, reforestation or revegetation (using only plants native to the area) and/or removal of non-native, invasive plant species.

D.     Within 240 days of commencing development of the Project Plan, IPL shall submit the plan to IDEM for its review and concurrence that IPL has complied with the requirements of Paragraph B above. Following concurrence, IDEM will oversee the plan to ensure that acquisition of the Environmentally Significant Lands will be undertaken in accordance with any and all requirements of the U.S. Fish and Wildlife Service, which has agreed to cooperate and consult on IPL's development and implementation of the Plan and IDEM's oversight of the Project.

E.     Project Dollars include all external costs incurred by IPL to acquire and donate Ecologically Significant Lands, including the purchase price of the property, costs of appraisal, title search and insurance, recording fees and associated costs of closing, and to fund restoration of such Lands, if approved by IDEM under Section II.C. of this Appendix.

F.     Project Dollars shall be expended within four years of Consent Decree entry, unless an extension is provided by IDEM.

G.     IPL shall prepare a Project Completion Report according to the timeline and requirements in Section XIV of the Consent Decree.